# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### GREENBELT DIVISION

| | | |
|---|---|---|
| **WISSAM ABDULLATEFF SA'EED** | * | |
| **AL-QURAISHI, et al.,** | * | |
| | * | |
| **Plaintiffs** | * | |
| | * | |
| **v.** | * | **Civil No.: PJM 08-1696** |
| | * | |
| **ADEL NAKHLA, et al.,** | * | |
| | * | |
| **Defendants** | * | |
| | * | |

## OPINION

Plaintiffs, 72 Iraqi citizens who were formerly detained at military prisons in Iraq, have sued L-3 Services, Inc. ("L-3"), a military contractor which provided civilian translators for United States military forces in Iraq, and Adel Nakhla, a former employee of L-3 who served as one of its translators there. The Complaint alleges that Defendants tortured and otherwise physically and mentally abused Plaintiffs during their detention and that they should be held liable in damages for their actions.

Plaintiffs assert 20 causes of action: 1) torture; 2) civil conspiracy to torture; 3) aiding and abetting torture; 4) cruel, inhuman, or degrading treatment; 5) civil conspiracy to treat Plaintiffs in a cruel, inhuman, or degrading manner; 6) aiding and abetting cruel, inhuman, and degrading treatment; 7) war crimes; 8) civil conspiracy to commit war crimes; 9) aiding and abetting the commission of war crimes; 10) assault and battery; 11) civil conspiracy to assault and batter; 12) aiding and abetting assaults and batteries; 13) sexual assault and battery; 14) civil conspiracy to sexually assault and batter; 15) aiding and abetting sexual assaults and batteries; 16) intentional infliction of emotional distress; 17) civil conspiracy to inflict emotional distress;

18) aiding and abetting intentional infliction of emotional distress; 19) negligent hiring and supervision; and 20) negligent infliction of emotional distress. Counts 1 – 9 are brought pursuant to the Alien Tort Statute, 28 U.S.C. § 1350. Counts 10 – 20 are state law claims. Counts 19 and 20, the negligence claims, are brought only against Defendant L-3.

Defendants have filed Motions to Dismiss on a number of grounds. They argue that the suit must be dismissed in its entirety because they are immune under the laws of war, because the suit raises non-justiciable political questions, and because they possess derivative sovereign immunity. They seek dismissal of the state law claims on the basis of government contractor immunity, premised on the notion that Plaintiffs cannot proceed on state law claims which arise out of combatant activities of the military. Defendants also aver that the causes of action brought under the Alien Tort Statute are not cognizable since none of their actions violated the law of nations, as the statute requires. They further contend that the state law claims are governed by the substantive law of Iraq which makes them immune from suit or, if not immune, that at least some of the claims are not cognizable under Iraqi law. Finally, Defendants assert that Plaintiffs have failed to plead sufficient facts in support of their claims of conspiracy and aiding and abetting.

The Court has considered the parties' initial briefs, heard oral arguments, and reviewed their supplemental briefs and filings.

For the reasons that follow, the Court **DENIES** Defendants' Motions to Dismiss.

On the facts alleged, Defendants' actions arguably violated the laws of war such that they are not immune from suit under the laws of war. Further, the suit does not raise a political question since this is a suit against private actors which does not implicate the separation of powers issues which the political question doctrine is meant to protect. Additionally, the Court

is not inclined, at this stage of the proceedings, to find that Defendants are shielded by derivative sovereign immunity, since the Court is unable to determine from the Complaint alone that Defendants were acting within the scope of their contracts with the United States as that defense requires. The Court further rejects the government contractor immunity defense since Defendants' asserted premise for the defense – that the claims arise out of combatant activities of the military – is not a valid basis for the defense. The Court declines to dismiss the Alien Tort Statute claims since, in the Court's judgment, Plaintiffs' claims constitute recognized violations of the law of nations, appropriately assertable against Defendants. As for Plaintiffs' state law claims, the Court finds that they are governed by Iraqi law. However, without referring to information outside the four corners of the Complaint, in particular Defendants' contracts, the Court is unable to determine at this time whether Defendants are in fact immune under Iraqi law. Accordingly, as to this latter argument, as well as to the question of whether Plaintiffs' claims are cognizable under Iraqi law, the Court defers decision pending discovery. Finally, the Court finds that Plaintiffs have set forth sufficient facts to make out claims of conspiracy and aiding and abetting.

## I.  Statement of Facts[1]

In March 2003, a military coalition led by the United States invaded Iraq and toppled the regime of its then-leader Saddam Hussein. Coalition forces have remained in Iraq as an occupying force ever since, engaged in the process of rebuilding the country to the end of returning governing power to the Iraqis. Throughout the occupation, coalition forces have fought with and been subject to attack by insurgents employing guerilla-style tactics.

---

[1] Some background information relating to the Iraqi war and its occupation is not part of the Complaint, and is drawn from media reports with respect to these matters. The information is included to provide context to the facts pled.

During the occupation, the U.S. military contracted with L-3, a Delaware corporation headquartered in Virginia, to provide civilian translators of Arabic in connection with military operations. These translators worked at, among other places, military prisons and detention facilities in Iraq. Adel Nakhla, a naturalized U.S. citizen born in Egypt,[2] worked for L-3 as an Arabic translator from June 2003 through May 2004 at the Abu Ghraib prison located outside of Baghdad, which was used by the U.S. military to detain suspected subversives taken into custody. Nakhla is no longer employed by L-3 and currently resides in Montgomery County, Maryland.

According to their Complaint, Plaintiffs are 72 Iraqis who were arrested by coalition forces and held at various military-run detention facilities in Iraq, including Abu Ghraib prison. Their periods of detention occurred between July 2003 and May 2008 and varied in length from less than a month to more than four years. All Plaintiffs allege that they were innocent of any crimes and that they were eventually released from custody without being charged with any crimes.

They all allege, however, that during their custody they were tortured and otherwise mistreated by L-3 employees, including Nakhla, and others working with them. The abuses they allege include: beatings, hanging by the hands and feet, electrical shocks, mock executions, dragging across rough ground, threats of death and rape, sleep deprivation, abuse of the genitals, forced nudity, dousing with cold water, stress positions, sexual assault, confinement in small spaces, and sensory deprivation. Plaintiffs also allege that their individual mistreatment occurred as part of a larger conspiracy involving L-3 and its employees, certain members of the military, and other private contractors. Despite the alleged involvement of some military personnel in these acts, Plaintiffs claim that Defendants were not authorized by the U.S. Government to

[2] Information as to Nakhla's citizenship and nationality is taken from his Motion to Dismiss.

commit the wrongful acts and that they were acting independently of and contrary to orders and directives of the U.S. military.

## II. Legal Standards for Dismissal

Defendants' Motions to Dismiss are brought pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), a party may seek dismissal for "lack of subject-matter jurisdiction." "The plaintiff has the burden of proving that subject matter jurisdiction exists." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (citation and quotation marks omitted). "The district court should grant the Rule 12(b)(1) motion to dismiss only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (citation and quotation marks omitted).

Rule 12(b)(6) governs dismissal of a complaint for "failure to state a claim upon which relief can be granted." "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and quotation marks omitted). "[I]n evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The court will also "draw[] all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). But "legal conclusions, elements of a cause of action, and bare assertions

devoid of further factual enhancement fail to constitute well-pled facts." *Nemet Chevrolet*, 591 F.3d at 255. "[A] complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)) (quotation marks omitted). "Facial plausibility is established once the factual content of a complaint 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949). "[T]he complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1952).

The Court considers the several grounds asserted by Defendants in support of their Motions to Dismiss.

### III.  Whether Aliens Detained Abroad by the Military Are Barred from Bringing Suit Based on Their Detention

Defendants contend first that under the laws of war, aliens detained abroad by the military cannot sue for damages for treatment arising out of their confinement. They say that the Supreme Court's decision in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), forecloses such suits through a bright line rule that "[a]lien enemies resident abroad cannot maintain a civil action of any type in United States courts." L-3 Mot. to Dismiss at 10. Defendants trace the *Eisentrager* rule to two lines of cases: one denying compensation for enemy property destroyed during wartime and the second holding that members of an occupying military force are exempt from the local laws and local tribunals of the occupied territory.

A review of these cases suggests that they are either inapplicable or do not stand for the propositions Defendants suggest.

### A.  *Johnson v. Eisentrager*

In *Eisentrager*, a group of Nazi soldiers was convicted by a military tribunal of violations of the law of war and incarcerated in Germany in a military prison operated by the United States military.  339 U.S. at 765-66.  The prisoners sought habeas corpus relief in a United States district court.  *Id.*  The Supreme Court denied relief on the grounds that the district court lacked jurisdiction to issue the writ since the prisoners were held to have no constitutional right to habeas corpus.  *Id.*at 790-91.  Based on six factors, said the Court, constitutional habeas corpus would not extend to a prisoner who

> (a) is an enemy alien; (b) has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is at all times imprisoned outside the United States.

*Id.* at 777.

The Court took note of the practical problems in granting the prisoners relief.  "To grant the writ to these prisoners might mean that our army must transport them across the seas for hearing."  *Id.* at 778-79.  Such a hearing would require "allocation of shipping space, guarding personnel, billeting and rations" and transportation for witnesses.  *Id.* at 779.  Finally, the writ would be "available to enemies during active hostilities" and would "hamper the war effort and bring aid and comfort to the enemy," "diminish the prestige of our commanders," and fetter a commander by allowing "the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention."  *Id.*

To the extent that *Eisentrager*'s denial of habeas to Nazi war criminals might once have kept Plaintiffs in this case from seeking damages for alleged acts of torture by private military contractors, the Supreme Court's decisions in *Rasul v. Bush*, 542 U.S. 466 (2004), and

*Boumediene v. Bush*, 128 S. Ct. 2229 (2008), have significantly narrowed *Eisentrager*'s scope, making it, in this Court's view, inapplicable to the present case.

In *Rasul*, the Court determined that detainees at the United States' naval base at Guantanamo Bay, Cuba were entitled to seek habeas relief under the general habeas corpus statute, 28 U.S.C. § 2241, as then written. 542 U.S. at 479. The Court considered *Eisentrager* at length and noted three important ways in which it did not control their decision in *Rasul*, which also serve to distinguish the present case from *Eisentrager*.

First and most important, the petitioners in *Rasul* had brought additional non-habeas claims as part of their petition. These claims, brought under the Alien Tort Statute, were dismissed by the lower courts, which read *Eisentrager* to say that aliens in military custody abroad lack the "privilege of litigation" in courts of the United States. *Id.* at 473. The Supreme Court flatly rejected this argument, declaring that "nothing in *Eisentrager* or in any of our other cases categorically excludes aliens detained in military custody outside the United States from the privilege of litigation in U.S. courts." *Id.* at 484-85 (quotation marks omitted). "The courts of the United States have traditionally been open to nonresident aliens." *Id.* (citing *Disconto Gesellschaft v. Umbreit,* 208 U.S. 570, 578 (1908) ("Alien citizens, by the policy and practice of the courts of this country, are ordinarily permitted to resort to the courts for the redress of wrongs and the protection of their rights.")). "The fact that petitioners in these cases are being held in military custody is immaterial to the question of the District Court's jurisdiction over their nonhabeas statutory claims." *Id.* at 485. This unequivocal statement - that aliens detained abroad by the military are not inherently barred from bringing suit in the United States - sharply contradicts Defendants' broad assertion in the present case that enemy aliens detained abroad cannot maintain a civil action of any type in United States courts.

Second, the *Rasul* Court explained that *Eisentrager* dealt only with the constitutional right to habeas corpus, not the statutory right.  *Id.* at 476-77.  The Court noted that at the time of *Eisentrager*, precedent dictated that statutory habeas was unavailable to prisoners outside the territorial jurisdiction of the district court.  *Id.*  However, the case which had established this rule had since been overturned, thus abrogating that bar to statutory habeas.  *Id.* at 478-79.  After evaluating the wording of the habeas statute, the *Rasul* Court determined that petitioners' claims fell within the scope of the statute and therefore remanded the case to the district court to adjudicate the merits of their claims.  *Id.* at 483-84, 485.  In this respect, *Rasul* indicates that when aliens detained abroad seek to bring suit in a court of the United States, their access to the courts does not depend on a constitutional nexus, only a statutory right.  In *Rasul*, the petitioners could proceed where their claims arose from statute, regardless of whether they had any separate constitutional entitlement to seek relief.  In the present case, Plaintiffs' claims are based on the Alien Tort Statute and other state laws, separate and distinct from any constitutional entitlement, or lack thereof, to bring suit.

Third, the Court in *Rasul* discussed the six factors mentioned in *Eisentrager* as well as the "practical problems" which led to the *Eisentrager* decision.  As to the six factors, said the Court, "*Eisentrager* made quite clear that all six of the facts [were] critical to its disposition."  *Id.* at 475-76.  After discussing how all six factors interrelated in *Rasul*, the Court concluded that "[p]etitioners in these cases differ from the *Eisentrager* detainees in important respects."  *Id.* at 476.  The same may be said of the case at bar.  Consideration of the six factors as they relate to the present case suggests that the Plaintiffs' situation differs from that of the prisoners in *Eisentrager*.  The only factors Plaintiffs and the *Eisentrager* petitioners have in common are the

first two.  Plaintiffs here appear to be enemy aliens,[3] and there is nothing in the Complaint to suggest they have ever been or resided in the United States.  The other four factors, however, are not met.  Plaintiffs were not held as prisoners of war, but were instead arrested for reasons unknown; indeed they were never charged with any crimes.  They were never tried or convicted of anything, let alone violations of the laws of war.  Finally, none of the Plaintiffs in this case are still imprisoned.  The fact that all six of these factors were deemed "critical" to the holding in *Eisentrager* argues strongly against extending that holding to a situation where only two of the six factors obtain.

Similarly, the "practical problems" of *Eisentrager* are not in play in this case.  Since Plaintiffs are no longer in custody, there is no need for the Government to supply "shipping space, guarding personnel, billeting and rations" or any other assistance in bringing them or their witnesses into court.  The concern that allowing the suit to proceed would diminish the prestige of our commanders or fetter our military's ability to wage war is also not present.   As will be discussed in the sections dealing with the political question doctrine, *infra* Part V, and derivative sovereign immunity, *infra* Part VI, given the allegations of the Complaint, the private contractors in this suit do not stand in the shoes of the military.  Allowing the suit to proceed will not place an unfair burden on the military or result in the Court injecting itself into the military's sphere of operations.

The Supreme Court's decision in *Boumediene* fortifies the conclusion that *Eisentrager* does not prevent aliens confined abroad by the military from suing over the conditions of their

---

[3] "Enemy alien" status applies to every subject of a foreign state at war with the United States, without reference to whether that person is actually hostile to the United States.  *Guessefeldt v. McGrath*, 342 U.S. 308, 322 (1952); *Conrad v. Waples*, 96 U.S. 279, 290 (1877) (citizens of a hostile nation are automatically deemed enemy aliens "by the mere fact of being inhabitants of that territory, without reference to any hostile disposition manifested or hostile acts committed by them").  Here, since Plaintiffs are Iraqi nationals, they are deemed enemy aliens for the duration of the war regardless of whether they actually fought against or have any personal enmity towards the United States.

confinement.  By the time of *Boumediene*, in response to the decision in *Rasul*, Congress had modified the habeas statute to prevent detainees at Guantanamo Bay from seeking habeas relief. 128 S. Ct. at 2241.  Even so, the Court held that the detainees were entitled to the protection of constitutional habeas corpus under the Suspension Clause of the U.S. Constitution.  128 S. Ct. at 2240 (discussing U.S. Const., Art. 1, § 9, cl. 2).  Unlike *Rasul*, *Boumediene* focused on the reach of the Constitution and the Suspension Clause abroad rather than on the general ability of aliens detained abroad by the military to sue in United States courts.  In considering the impact of *Eisentrager*, the Court stated that *Eisentrager* did not create any "formalistic" tests as to the ability to bring suit and was instead based on "practical considerations" such as those discussed above.  *Id.* at 2257.

In light of the Supreme Court's willingness in *Rasul* and *Boumediene* to entertain suits brought by aliens and its meticulous parsing of *Eisentrager*'s reasoning, this Court does not accept Defendants' contention that *Eisentrager* categorically prohibits enemy aliens detained abroad by the military from bringing civil suits in the United States.  Plaintiffs possess the "privilege of litigation" in United States courts.

**B.  Enemy Property Cases**

In support of their argument that aliens detained by the military abroad are barred from bringing suit based on their detention, Defendants also invite the Court's attention to a line of cases in which aliens were denied compensation for property destroyed during wartime.  The Court agrees that under the laws of war belligerents possess great latitude to confiscate or destroy enemy property.   That latitude, however, is not limitless.  The same principle applies to injury to people.  While a belligerent may lawfully inflict death and destruction upon the enemy, the law of war nevertheless places some limits on the wanton and malicious treatment of human

lives.  While the Government or members of the military may not be liable for property destroyed or seized pursuant to the laws of war, this immunity does not extend to acts of torture committed in violation of the laws of war.  The Court reviews the caselaw.

Nations have "the power to prosecute [war] by all means and in any manner in which war may be legitimately prosecuted."  *Miller v. United States*, 78 U.S. (11 Wall.) 268, 305 (1870).  "[T]he authority of a conquering power . . . is, however, not without limitation, and . . .  is subject to the laws and usages of war, and, we may add, to such rules as are sanctioned by established principles of international law."  *MacLeod v. United States*, 229 U.S. 416, 432 (1913) (citation omitted); *Gates v. Goodloe*, 101 U.S. 612, 617 (1879) (military commander could "suppress[] rebellion by all the means which the usages of modern warfare permitted"); *Planter's Bank v. Union Bank*, 83 U.S. (16 Wall.) 483, 495 (1872) (military commander is only limited by what "the laws of war permit[], . . . the pledged faith of the government, or by the effect of Congressional legislation").  A conquering power "may do anything necessary to strengthen itself and weaken the enemy," and "[t]here is no limit to the powers that may be exerted in such cases, save those which are found in the laws and usages of war."  *City of New Orleans v. N.Y. Mail S.S. Co.*, 87 U.S. (20 Wall.) 387, 394 (1874).

Enemy property, in particular, is "subject to seizure, confiscation, and destruction."  *Herrera v. United States*, 222 U.S. 558, 569 (1912).  Property "may be temporarily occupied or injured, or even destroyed, on the theater of and by military operations, either in a loyal State or in enemy's country, in time of war, as a military necessity."  *Nat'l Bd. of Young Men's Christian Ass'ns v. United States*, 396 F.2d 467, 473 (Ct. Cl. 1968).  "The necessities of the war call[] for and justif[y] this."  *Id.* at 470.  Because it is a belligerent's prerogative to seize or destroy enemy property, it is "well recognized that a destruction of private property in battle or by enemy forces

is not compensable." *Id.*; *United States v. Pacific R.R.*, 120 U.S. 227, 239 (1887) ("[F]or injuries to or destruction of private property in necessary military operations during the civil war, the government is not responsible."). "[I]f actual war has been waged, acts of legitimate warfare cannot be made the basis of individual liability." *Underhill v. Hernandez*, 168 U.S. 250, 253 (1897).

Since the power to seize or destroy enemy property is so broad, military commanders enjoy ample discretion to determine what property should be seized or destroyed to further the war effort without giving rise to civil liability. *See United States v. Caltrex*, 344 U.S. 149, 155 (1952) (not a taking to raze oil terminals which could be a "potential weapon of great significance" to enemy and were "destroyed that the United States might better and sooner destroy the enemy"); *Pacific R.R.*, 120 U.S. at 153-54 ("Whatever would embarrass or impede the advance of the enemy, as the breaking up of roads, or the burning of bridges, or would cripple and defeat him, as destroying his means of subsistence, were lawfully ordered by the commanding general."); *Nat'l Bd.*, 396 F.2d at 472 ("[C]onfiscation of private property . . ., through destruction or otherwise, to prevent it from falling into enemy hands, or to protect the health of troops, or as an incidental element of defense against hostile attack [] is not compensable under the fifth amendment."); *Franco-Italian Packing Co. v. United States.*, 128 F. Supp. 408, 414 (Ct. Cl. 1955) (seizure of boats "arising from the exercise of judgment by an officer charged by the United States with the direct duty of defending the western approaches to the Panama Canal from enemy attack" was not a taking).

All this said, a belligerent's right to seize or destroy enemy property is not unbounded. *The Paquete Habana*, 175 U.S. 677, 709 (1900) ("The same law of nations, which prescribes that all property belonging to the enemy shall be liable to confiscation, has likewise its modifications

and relaxations of that rule.").  Certain types of property have been deemed exempt from destruction or capture during war, despite the fact that attacking or destroying them might "better and sooner destroy the enemy."  *Caltrex*, 344 U.S. at 155.  For example, hospitals, hospital ships, and other facilities and equipment used to treat the sick and wounded are immune from attack, destruction, or harassment so long as they are used for humanitarian purposes.  *United States v. Banks*, 4 M.J. 620, 620-23 (N.C.M.R. 1977) (discussing treaties and customary international law which exempt medical personnel and facilities from attack during war).  Some types of seagoing vessels, despite being enemy property used by enemy aliens, are also afforded protection.  "By the practice of all civilized nations, vessels employed only for the purposes of discovery or science are considered as exempt from the contingencies of war."  *Paquete Habana,* 175 U.S. at 709.  It is also "an established rule of international law, founded on considerations of humanity to a poor and industrious order of men, . . . that coast fishing vessels, with their implements and supplies, cargoes and crews, unarmed and honestly pursuing their peaceful calling of catching and bringing in fresh fish, are exempt from capture."  *Id.* at 708; *see also United States v. Dewey*, 188 U.S. 254, 278-79 (1903) (same for small, coastal commercial boats and barges even though they are enemy property).  Art objects and items of cultural importance are afforded similar special treatment since "[t]he arts and sciences are admitted amongst all civilized nations, as forming an exception to the severe rights of warfare, and as entitled to favor and protection." 175 U.S. at 709 (quoting *The Marquis de Somerueles*, 1 Stew. V.A. 482, 483 (Vice-Adm. Ct. N.S. 1813) (ordering restitution of captured paintings and printings which were taken from an otherwise lawfully seized ship)); *see also The Amelia*, 1 F. Cas. 595, 595-96 (D. Penn. 1861) (ordering return of books destined for the University of North Carolina library taken from otherwise lawfully seized vessel).

These limitations are well illustrated by *The Paquete Habana*, where a United States warship captured two coastal fishing vessels off the coast of Cuba during the Spanish-American War. 175 U.S. at 679. The ships were owned and operated by Spanish subjects, making them enemy property. *See id.* at 678-79. The Court, after a lengthy review of the law of war and its relationship to fishing vessels, determined that the two ships were exempt from capture. *Id.* at 714. The Navy's actions being illegal, the Court ordered that the owners receive restitution and damages for the vessels, notwithstanding that the actions occurred in wartime and would have been lawful if taken against a different class of ship. *Id.*

This same principle was considered in *Luther v. Boren*. 48 U.S. (7 How.) 1, 34 (1849). Defendants there were militia members in Rhode Island who assisted in suppressing an armed insurrection in the state. *Id.* Martial law was declared and defendants were ordered to arrest plaintiff as part of suppressing the rebellion. *Id.* Accordingly, defendants broke into plaintiff's house to arrest him, and plaintiff later sued for damages, claiming defendants had acted unlawfully. *Id.* The Court, in discussing the merits, considered "whether the defendants, acting under military orders issued under the authority of the government, were justified in breaking and entering the plaintiff's house." *Id.* at 45. The Court ultimately decided defendants' acts were appropriate, stating that "[i]t was a state of war; and the established government resorted to the rights and usages of war to maintain itself, and to overcome the unlawful opposition." *Id.* But, the Court went on to declare that

> No more force, however, can be used than is necessary to accomplish the object. And if the power is exercised for the purposes of oppression, or any injury willfully done to person or property, the party by whom, or by whose order, it is committed would undoubtedly be answerable.

*Id.* at 46.

The direction of these cases dealing with affronts to property is clear: A defendant can only claim immunity under the laws of war if its actions comport with the laws of war. During wartime, "many things are lawful in that season, which would not be permitted in a time of peace." *Respublica v. Sparhawk*, 1 U.S. (1 Dall.) 357, 362 (1788). Some actions, however, have been deemed so repulsive to mankind, or so disconnected from prosecuting and winning a war, that they are universally condemned. The law of war attempts to rein in these behaviors. And just as there are rules regulating the treatment of property, there are also rules pertaining to the treatment of people.

One such universally recognized rule is that torture is prohibited. "Among the rights universally proclaimed by all nations . . . is the right to be free of physical torture." *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2nd Cir. 1980). "Indeed, for purposes of civil liability, the torturer has become like the pirate and slave trader before him *hostis humani generis*, an enemy of all mankind." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 731 (2004) (quoting *Filartiga*, 630 F.2d at 890). Torture is "among the outright violations of the laws of war and of the conscience of a civilized world." *Application of Yamashita*, 327 U.S. 1, 29 (1946). The prohibition against torture is recognized as a *jus cogens* norm, which is to say, "a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332).

Treaties, conventions, and declarations from around the world further support the global consensus that torture is a violation of the law of nations and is never permitted, even in wartime. *See e.g.*, The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 39 U.N. GAOR Supp. (No. 51), 23 I.L.M. 1027 (1984); Declaration on the

Protection of All Persons from Being Subjected to Torture, G.A. Res. 3452, 30 U.N. GAOR Supp. (No. 34) at 91, U.N. Doc. A/1034 (1975); American Convention on Human Rights, Nov. 22, 1969, 36 O.A.S.T.S. 1, O.A.S. Official Records OEA/Ser. 4 v/II 23, doc 21, rev. 2 (1975); European Convention for the Protection of Human Rights and Fundamental Freedoms, Art. 3, Council of Europe, Europ. T.S. No. 5, 213 U.N.T.S. 211 (1968); International Covenant on Civil and Political Rights, Annex to G.A. Res. 2200(XXI)a, 21 U.N. GAOR Supp. (No. 16), U.N. Doc. A/6316 (1966); Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, arts. 3, 12, 50, August 12, 1949, 6 U.S.T. 3114; Geneva Convention Relative to the Protection of Prisoners of War, arts. 3, 17, 87, Aug. 12, 1949, 6 U.S.T. 3316; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, arts. 3, 32, 147, Aug. 12, 1949, 6 U.S.T. 3516; Geneva Convention for the Amelioration of the Condition of Wounded, Sick, and Shipwrecked Members of the Armed Forces, arts. 3, 12, 51, August 12, 1949, 6 U.S.T. 3217; Universal Declaration of Human Rights, G.A. Res. 217A(III), 3 U.N. GAOR Supp. (No. 16), U.N. Doc. A/810 (1948).

Domestic laws of the United States reinforce the international scope of the prohibition against torture. *See, e.g.* 10 U.S.C. §§ 801, 950v; 18 U.S.C. §§ 2340A, 2441; 22 U.S.C. § 2152; 28 U.S.C. § 1350, statutory note.

Plaintiffs in the present case have alleged that Defendants inflicted numerous acts of torture upon them, including beatings, mock executions, threatening them with death and rape, and electrical shocks. The actions alleged, if proven, clearly exceed the immunities ordinarily afforded to belligerents. The Court concludes that Defendants are not shielded by the laws of war against liability for the violent conduct said to have occurred here.

**C. Civil Liability of Soldiers and Contractors in Local and Domestic Civilian Courts**

Defendants also ask the Court to consider a line of cases holding that, under the law of war, members of the military are exempt from local laws and immune from suit in the local courts of a country which the military has invaded or occupied. Defendants aver that this principle, by extension, also immunizes military contractors from the domestic laws and domestic courts of their own nation. The Court disagrees. While Defendants may be immune under the law of war from suit in the courts of Iraq, caselaw does not support expanding this rule to protect Defendants against suit in the courts of the United States.

Defendants rely primarily on *Dow v. Johnson*, 100 U.S. 158 (1879), which involved a defendant who was a Union army general commanding an occupation force in Louisiana during the Civil War. *Id.* at 158-59. While the war was still in progress, plaintiff sued defendant in a Louisiana court after soldiers under defendant's command seized property from plaintiff's house. *Id.* at 159-60. Defendant did not appear at trial and a default was entered against him. *Id.* at 160. Plaintiff later sought to enforce the judgment in a court of the United States. *Id.* at 161. The Supreme Court eventually determined that the judgment was void since the Louisiana court which had issued the judgment was deemed to have lacked jurisdiction, under the law of war, over a member of the conquering army. *Id.* at 169. The Court stated that when "our armies marched into . . . the enemy's country, their officers and soldiers were not subject to its laws, nor amenable to its tribunals for their acts." *Id.* at 165.

*Dow*, in dicta, does contain some apparently conflicting language on the question of whether soldiers are also immune from suit in the domestic tribunals of their home country. Thus, in one part of the opinion, the Court states that the soldiers "were subject only to their own government, and only by its laws, administered by its authority, could they be called to account." *Id.* In contrast, however, the Court later states that

> If guilty of wanton cruelty to persons, or of unnecessary spoliation of property, or of other acts not authorized by the laws of war, they may be tried and punished by the military tribunals. They are amenable to no other tribunal, except that of public opinion, which, it is to be hoped, will always brand with infamy all who authorize or sanction acts of cruelty and oppression.

*Id.* at 166.

Admittedly, this latter language suggests that soldiers would be immune from civil liability in domestic courts even for acts which violate the laws of war, and that they could only be prosecuted by military tribunals. But, accepting that this statement may once have been valid, later caselaw has rather clearly qualified it. In *Freeland v. Williams*, the Supreme Court had the opportunity to discuss its holding in *Dow*, and stated

> Ever since the case of *Dow v. Johnson* [], the doctrine has been settled in the courts that in our late civil war each party was entitled to the benefit of belligerent rights, as in the case of public war, and that, for an act done *in accordance with the usages of civilized warfare under and by military authority* of either party, no civil liability attached to the officers or soldiers who acted under such authority.

131 U.S. 405, 416 (1889) (emphasis added). The broad statement in *Dow* suggesting that the law of war grants total immunity in any civil court is thus an outlier compared to the numerous cases, discussed *supra* Part IV.B, holding that immunity under the law of war only extends to acts done in accordance with the law of war. *Freeland*'s restatement of *Dow*'s holding brings *Dow* into line with these cases. *Dow* is therefore better read, in this Court's view, as standing for the proposition that the courts of an enemy nation cannot pass judgment over occupying soldiers, rather than for the principle that soldiers are invariably immune in any civil court for any act taken during wartime.

Another reason why it may be said that *Dow* created no new rules as to the civil liability of members of the military in domestic courts is that domestic courts have in fact held military members civilly liable for actions taken during wartime. *See The Paquete Habana,* 175 U.S.

677, 712-14 (1900) (damages imposed for unlawful seizure of fishing vessels during military operation); *Mitchell v. Harmony,* 54 U.S. 115, 135-37 (1851) (soldier liable for trespass for wrongful seizure of citizen's goods while in Mexico during Mexican War); *Little v. Barreme,* 6 U.S. 170, 177-79 (1804) (naval officer liable to ship owner for damages for illegal seizure of his vessel during wartime).  Other courts, while ultimately finding no civil liability, have examined on the merits whether a given act violated the law of war, as opposed to dismissing the case outright regardless of the act committed.  *See Ford v. Surget*, 97 U.S. 594, 605-06 (1878) (defendant not liable for burning cotton since act of destroying property to prevent it from falling into enemy hands was allowed under the laws of war); *Lamar v. Browne*, 92 U.S. 187, 194 (1875) (no liability for defendant who seized cotton which could have been sold to support rebellion); *Luther*, 48 U.S. at 46 (no liability for defendant breaking and entering house to arrest member of insurrection).

Since the Court finds that in some instances members of the military are amenable to civil suits in domestic courts, it finds that *a fortori* military contractors are also amenable to civil suit.  As for the statement in *Dow* that members of the military "may be tried and punished by the military tribunals" and "are amenable to no other tribunal," 100 U.S. at 166, assuming this even were an accurate statement of the law, the rule would still only apply to members of the military and not to contractors.  It was not until late-2006, with the passage of the National Defense Authorization Act for Fiscal Year 2007 § 552, 10 U.S.C. § 802(a)(10), that military contractors such as those serving in Iraq and Afghanistan were made subject to trial by military tribunals.[4]  If contractors were truly immune from suit in domestic civilian courts, as Defendants

---

[4] Prior to the passage of the Act, civilian contractors were subject only to trials before military tribunals during "a war formally declared by Congress," not for other types of military conflicts, even though the conflicts may have been "a war as that word is generally used and understood."  *United States v. Averette*, 41 C.M.R. 363, 365-66

assert, then from the time of *Dow* they would have existed in a lawless loophole where they were not subject to the laws of any court, civilian or military. The better reading of *Dow*'s statement that soldiers are subject only to military tribunals, if accurate, is that it only applies to soldiers but has no bearing on whether military contractors are subject to domestic civilian courts.

## IV. Whether Plaintiffs' Suit Is Nonjusticiable Under the Political Question Doctrine

Defendants next contend that Plaintiffs' suit is nonjusticiable under the political question doctrine. "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). If deciding a case would require a court "to move outside the customary areas of judicial competence or if other prudential considerations counsel against judicial intervention, then [the court] must conclude that the controversy is nonjusticiable." *Tiffany v. United States*, 931 F.2d 271, 276 (4th Cir. 1991) (citation and quotation marks omitted).

The Supreme Court in *Baker v. Carr* set forth six separate factors which would demonstrate the presence of a political question.

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

---

(C.M.A. 1970) (holding military contractor in Vietnam not subject to prosecution by military tribunal since Vietnam War not initiated by a formal declaration of war from Congress).

*Baker*, 369 U.S. at 217.  But, "[u]nless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence."  *Id.*

District courts have also been cautioned to distinguish between "political questions," which raise separation of power concerns, and "political cases," which may be controversial but do not impinge upon any branch's constitutional powers.  *Id.*  "The courts cannot reject as [nonjusticiable] a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority."  *Id.*  While many cases involving foreign affairs do raise political questions, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."  *Japan Whaling*, 478 U.S. at 229-30 (quoting *Baker*, 369 U.S. at 211).  "[T]he fact that an action is taken in the ordinary exercise of discretion in the conduct of war does not put it beyond the judicial power."  *Koohi v. United States*, 976 F. 2d 1328, 1332 (9th Cir. 1992) (quotation marks omitted); *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1358 (11th Cir. 2007) ("[I]t is clear that not even military judgments are completely immune from judicial review.").  The court must make "a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action."  *Baker*, 369 U.S. at 211-12.  In an "ordinary tort suit" against a non-governmental entity, "[t]he department to whom this issue has been constitutionally committed is none other than our own - the Judiciary," which "strongly suggests that the political question doctrine does not apply."  *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2nd Cir. 1991) (quotation marks omitted).

In the present case, Defendants raise the first and second *Baker* factors as grounds for dismissal. The Court, however, finds that the separation of power concerns presented by those two factors are not at issue in this case, and therefore Plaintiffs' case is properly justiciable.

**A. Textually Demonstrable Constitutional Commitment of the Issue to a Coordinate Political Department**

With the Government's increased use of military contractors in Iraq and Afghanistan, a body of caselaw has begun to develop as to when suits against a military contractor implicate the political question doctrine. Among the cases which have rejected the political question doctrine as a defense are three which are almost factually identical to this case (i.e., alleged torture of detainees in Iraq by private military contractors). In *Al Shimari v. CACI Premier Technology, Inc.*, the U.S. District Court for the Eastern District of Virginia recognized that for a suit to be barred under the political question doctrine, plaintiffs must "challenge official policies and directives that were established by the executive branch and are consequently nonreviewable by the judiciary." 657 F. Supp. 2d 700, 708 (E.D. Va. 2009). There, as here, plaintiffs alleged that defendant contractors conspired together without orders from or approval by the Executive in their treatment of the detainees. *Id.* at 709. The court rejected the argument that simply because the private contractors worked in close proximity with members of the military there was "involvement and approval of high-level government officials" in defendants' acts. *Id.* The court explained that the suit "challenges not the government itself or the adequacy of official government policies, but the conduct of government contractors carrying on a business for profit." *Id.* "The judiciary is regularly entrusted with the responsibility of resolving this type of dispute." *Id.* at 710.

Similarly, in *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 16 (D.D.C. 2005), and *Saleh v. Titan Corp.*, 436 F. Supp. 2d 55, 57 (D.D.C. 2006), the U.S. District Court for the District of

Columbia determined that military contractors could not raise a political question defense against alleged acts of torture committed against detainees in Iraq.[5]  The court stated that "[a]n action for damages arising from the acts of private contractors and not seeking injunctive relief does not involve the courts in 'overseeing the conduct of foreign policy or the use and disposition of military power.'"  391 F. Supp. 2d at 15 (quoting *Luftig v. McNamara*, 373 F.2d 664, 666 (D.C. Cir. 1967)).  The court also noted that "[h]ere plaintiffs sue private parties for actions of a type that both violate clear United States policy and have led to recent high profile court martial proceedings against United States soldiers."  *Id.* at 16 (citation removed).[6]

Another case which rejected the political question defense is *McMahon v. Presidential Airways, Inc.*, a suit against a private charter airline which had contracted with the Government to transport military personnel in Afghanistan.  502 F.3d at 1337.  One of the company's planes crashed in Afghanistan killing three soldiers onboard, and the soldiers' next-of-kin sued the charter company for negligence.  *Id.*  In addressing the political question, the court stated that defendant: 1) "must demonstrate that the claims against it will require reexamination of a decision *by the military*;" and 2) "must demonstrate that the military decision at issue is . . . insulated from judicial review."  *Id.* at 1359-60 (emphasis in original).  While the military did have some control over the operation and use of the planes, plaintiffs only challenged as negligent decisions and actions which were made at the company's discretion without involvement by the military.  *Id.* at 1361-62.

---

[5] The court in *Saleh* incorporated by reference the reasoning in *Ibrahim*.  *Saleh*, 436 F. Supp. 2d at 57.

[6] *Saleh* and *Ibrahim* were consolidated on appeal and dismissed on grounds related to government contractor immunity.  *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009).  The D.C. Circuit's opinion did not address the district court's ruling on the political question doctrine.  Political questions, however, are a subject matter jurisdiction issue. The fact that the appellate court resolved the case on an affirmative defense suggests that the appellate court assumed that the district court had subject matter jurisdiction and that the case therefore did not raise a political question.

Several other cases have rejected the political question doctrine in civil suits against private military contractors. *See Lane v. Halliburton*, 529 F.3d 548, 555-56, 560 (5th Cir. 2008) (suit by contractor's employees who were injured in Iraq claiming that contractor negligently and fraudulently misrepresented the dangers of working in Iraq not a political question since contactor "is not part of a coordinate branch of the federal government" and claims did not address Army's role in protecting the contractors, only "actions taken and omissions made" by the contractor); *Koohi*, 976 F. 2d at 1332 (no political question in design defect suit against missile system manufacturer where U.S. Navy inadvertently shot down civilian plane, as military decisions are not inherently immune from review and because suit sought less-intrusive remedy of monetary damages rather than an injunction directed at future action); *Harris v. Kellogg, Brown & Root Services, Inc.*, 618 F. Supp. 2d 400, 427 (W.D. Pa. 2009) (suit over contractor's faulty wiring work on military base which led to soldier's electrocution not a political question since the claims "do not directly implicate professional military judgments" and "Army neither supervised nor inspected any of the repairs that [defendant] actually performed"); *Flanigan v. Westwind Technologies, Inc.*, 2008 WL 6714874, at *6, n.2 (W.D. Tenn. Sept. 15, 2008) (suit against combat helicopter manufacturers arising out of helicopter crash in Afghanistan not a political question since suit "does not seek to assign blame for [pilot]'s death to any inadequacies in Army training or flight procedures" and only addresses "actions taken solely by the [contractor] Defendants"); *Getz v. Boeing*, 2008 WL 2705099, at *5-8 (N.D. Cal. July 8, 2008) (design and manufacturing defect claims against contractor arising from military helicopter crash in Afghanistan not a political question since crash did not implicate military's decision making); *Potts v. Dyncorp Int'l LLC*, 465 F. Supp. 2d 1245, 1251-52 (M.D. Ala. 2006) (car accident caused by military contractor's employee while transporting supplies in Iraq did not raise

political question where convoy was directed by contractor and contractor was "not managed or controlled by the United States military forces"); *Lessin v. Kellogg Brown & Root*, 2006 WL 3940556, at *2-3 (S.D. Tex. June 12, 2006) (where military serviceman was struck in head and injured by malfunctioning ramp on contractor's truck while assisting in roadside repairs in combat zone, no political question since suit addressed contractor's negligent maintenance of truck and training of driver, not "policies or decisions of the military"); *Norwood v. Raytheon Corp.*, 455 F. Supp. 2d 597, 604-05 (W.D. Tex. 2006) (no political question in suit by military servicemen against radar manufacturer alleging radiation exposure from the radars, where suit challenged contractor's design and failure to warn, not military's use of the radars).

In contrast to the foregoing, the Eleventh Circuit in *Carmichael v. Kellogg, Brown & Root Services, Inc.* upheld dismissal of a suit against a military contractor based on the political question doctrine where a soldier riding in a truck operated by a private contractor as part of a supply convoy was injured when the truck veered off road and flipped over. 572 F.3d 1271, 1278 (11th Cir. 2009). The district court had initially denied the defendant's motion to dismiss on political question grounds, but reconsidered its decision after the parties had taken discovery. *Id.* at 1279. The appellate court found that the military totally controlled the operation of the convoy even though the drivers worked for the private contractor. *Id.* at 1281-82. For example, the military decided the date and time of the convoy's departure, the speed the convoy traveled, the route used, the quantity of cargo, the number of trucks, the distance between vehicles, and the security measures used to safeguard the convoy. *Id.* "[T]hese decisions required the specific exercise of *military* expertise and judgment," while there was "not the slightest hint in the record suggesting that [the contractor] played even the most minor role in making any of these essential decisions." *Id.* at 1282 (emphasis in original). Any attempt to evaluate the contractor's

negligence in driving the truck would require the court to also evaluate the military's judgments on how best to operate its supply convoys in a warzone, and that would violate the political question doctrine. *Id.* at 1283. The Eleventh Circuit also distinguished its prior opinion in *McMahon v. Presidential Airways, Inc.*, noting that while the military played only a minimal role in the operation of the crashed flight in *McMahon*, the military's control over the convoy in *Carmichael* was "plenary." *Id.* at 1290.

To be sure, other courts have dismissed suits against private military contractors under the political question doctrine. *See Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277, 1281-82 (M.D. Ga. 2006) (accident where contractor's truck struck and killed soldier in supply convey raised political question since contractor's drivers "were performing their duties subject to the military's planning, orders, and regulations," and military decided on "placement of vehicles in the convoy, distance between vehicles in the convoy, rate of speed of the convoy, and convoy escort and security"); *Smith v. Halliburton Co.*, 2006 WL 2521326, at *3 (S.D. Tex. Aug. 30, 2006) (where contractor's employee was killed by suicide bomber in mess hall at U.S. Army base in Iraq, suit by employee's estate claiming contractor failed to provide adequate security at mess hall raised a political question since "Army retained the authority and responsibility for the security and force protection functions at [base and mess hall] at all times under this contract" and contractor "was never entrusted with such security or force protection functions") (quotation marks omitted); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1497 (C.D. Cal. 1993) (in suit against missile manufacturer by estates of soldiers killed by friendly fire during combat due to malfunctioning missile targeting system, suit dismissed under political question doctrine since "claims necessarily require inquiry into military strategy and . . . orders to [combat aircraft] pilots and ground troops").

Viewing these cases collectively, however, suggests that when dealing with private military contractors, the presence *vel non* of a political question turns first on the level of actual control the military exerted over the contractor's actions which led to the alleged tortious conduct. Where the military is only minimally or peripherally involved in the contractor's actions or decisions (as in *McMahon*), or only exercises control over areas of the contractor's work unrelated to the precise behavior which led to the alleged tort (as in *Lane* and *Potts*), or only has control over a contractor at a general or theoretical level but not in practice (as in *Harris* and *Al Shimari*), the suit does not raise a political question. But where the military in fact exerts controlling authority over a contractor's actions and those actions result in a tort (as in *Carmichael* and *Whitaker*), examining the contractor's acts would necessarily require the court to second-guess the military's judgment. If that judgment is of the kind normally reserved for the political branches and not the Judiciary, then the suit raises a political question and cannot proceed.

In the case at bar, Plaintiffs have consistently alleged that L-3 and Nakhla were acting of their own volition and not following the instructions or policies of the political branches. Among other things, they claim: "L-3 permitted L-3 translators to ignore – repeatedly – the military's instructions to abide by the Geneva Conventions and permitted L-3 translators to abuse and torture prisoners," Pls.' Second Am. Compl. ¶ 430; "L-3 willfully failed to report L-3 employees' repeated assaults and other criminal conduct by its employees to the United States or Iraqi authorities," *id.* at ¶ 432; "L-3 affirmatively hid the misconduct of its employees from the United States military," *id.* at ¶ 433; "L-3 discouraged its employees from reporting prisoner abuse to the United States authorities," *id.* at ¶ 434; L-3 participated in "misleading non-conspiring military and government officials about the state of affairs at the prisons," *id.* at ¶

445(d); "Nakhla and L-3 knew that military officials were prohibited from torturing prisoners by the Army Field Manual and other controlling law, and that any military officials who were doing so were violating the law," *id.* at ¶ 450; "Nakhla and L-3 knew that the United States government has denounced the use of torture and other cruel, inhuman or degrading treatment at all times." *id.* at ¶451. Notably, the Complaint does not claim that L-3 or Nakhla acted under the orders, directions, or policies of either political branch in carrying out the allegedly tortious acts. At oral argument, Plaintiffs' counsel further averred that Defendants were not following the policies of the military or the Executive when they allegedly tortured Plaintiffs. Mar. 9, 2009 Hr'g Tr., 66:10-:12, 67:16-:22, 68:11-:23, 74:15-:23, 80:19-81:8.[7]

Plainly, Plaintiffs have limited their claims to the alleged acts of private contractors which did not arise out of the policies or orders of the military. Indeed, they contend that Defendants acted contrary to the policies of the United States and hid their actions from the Government. This is the critical point. That the contractors were in Iraq to work with the military, and by extension the Executive Branch, does not *ipso facto* signify that they were part of the Executive Branch. Even conspiring with low-level members of the military would not equate with acting under the direction of high-level executive officials constitutionally charged

---

[7] Defendants urge the Court to consider the Senate Armed Services Committee's *Inquiry into the Treatment of Detainees in U.S. Custody* (Nov. 20, 2008). This report indicates that high-ranking members of the Executive Branch approved some of the abusive interrogation practices said to have been used on Plaintiffs. The Court is not persuaded to alter its conclusion based on the *Inquiry*. First, the Court notes that after reviewing the report, it finds no specific references to L-3 (or Titan Corp., L-3's predecessor), Nakhla, or to any of the named Plaintiffs, making it difficult to apply the findings in the report to the specific facts of this case. Second, many of the acts of torture alleged by Plaintiffs go well beyond the detainee treatment techniques that were, in some cases only very temporarily, permitted under the policies described in the report. Third, and most importantly, at this early stage of the case, prior to any discovery, the Court cannot make a dispositive determination of the facts. As other courts have done, if discovery should reveal new information about the involvement of the political branches and the presence of a political question, this issue may become ripe for reconsideration. *See Carmichael,* 572 F.3d at 1279 (noting that district court initially denied defendant's motion to dismiss on political question grounds, then reconsidered after discovery revealed new information). The Court also notes that if it should later determine that Defendants' actions did arise out of the judgments or policies of the political branches, it will still need to consider whether these judgments or policies were of the type constitutionally committed to the political branches such that they would be insulated from judicial review.

with setting policy. When evaluating the status of contractors, the Court must consider whether the specific bad acts allegedly giving rise to the tort were intertwined with the non-reviewable judgments of the military. Here, Defendants are alleged to have operated independently of the military and its policies insofar as those acts are concerned. Plaintiffs do not challenge the constitutionally protected judgments of a political branch, only the decisions and actions of a private corporation and its employee.

*Tiffany v. United States*, 931 F.2d 271 (4th Cir. 1991), cited by Defendants, does not affect this calculus. In *Tiffany*, passengers on a private plane were killed when they flew unidentified into an air defense zone and collided with a military fighter plane sent to intercept and identify them. *Id.* at 272-75. The estates of the deceased passengers sued the Government, claiming negligence on the part of the military pilot and the ground control operators who ordered and supervised the interception. *Id.* The Fourth Circuit held that the case presented a political question and dismissed. *Id.* at 282. The case, said the court, "calls into question the government's most important procedures and plans for the defense of the country." *Id.* at 275. "If [the court] were to hold that the United States acted negligently in conducting the defense of its eastern border, we would be interjecting tort law into the realm of national security and second-guessing judgments with respect to potentially hostile aircraft that are properly left to the other constituent branches of government." *Id.* "Myriad possibilities for mischievous judicial inquiry abound: whether planes should have been sent at all; the proper number of planes; the routes they flew; the angles of the intercepts; the correct distance from the target; the proper reaction to weather conditions; the quality of the on-board radar system; the compatibility of communications systems." *Id.* at 279. "Courts are not in a position to dictate to a branch of the

Department of Defense how it should react when it faces unknown and potentially hostile aircraft." *Id.* at 278-79.

The major difference between the present case and *Tiffany* is that *Tiffany* was a suit against the Government itself while this suit challenges the actions of private contractors. Whether the tortious acts in question arose out of judgments of the military was not an issue there as it is here. Just as important, however, is the role the political branches played in the acts at issue in *Tiffany* versus those in this case. The military, employing its expertise and discretion, made determinations in *Tiffany* as to how best conduct an intercept of an unknown aircraft, determinations that could not be separated from other factors which led to the accident. Here, nothing in the facts before the Court at this juncture suggests that the Executive played a part in having L-3 and Nakhla torture Plaintiffs, the necessary implication being that Defendants' alleged actions were independent of the executive powers. Indeed, in light of the many legal prohibitions against torture, Defendants' alleged actions appear to be squarely at odds with the policies and judgments of the political branches. At the same time, determining whether a private party has committed a wrongful injurious act against another private party is quintessentially a tort issue of the sort that courts regularly adjudicate.

**B. Lack of Judicially Discoverable and Manageable Standards for Resolving the Case**

The other political question argument Defendants serve up is that the Court lacks judicially discoverable and manageable standards for resolving the case. They suggest that the Court will not be able to locate standards to evaluate the alleged torts and that necessary evidence is classified and will not be amenable to discovery. The Court finds neither concern a bar to proceeding.

The standards which Defendants raise as indeterminate or unmanageable are either not at issue here or are ultimately standards which a court would use in any other "ordinary tort suit." *Klinghoffer*, 937 F.2d at 49. For example, Defendants suggest the Court will need to devise a standard for evaluating the "military's battlefield determination that Plaintiffs were either enemy prisoners of war or required to be detained based on an imperative security need." L-3 Mot. to Dismiss at 26. Plaintiffs, however, are not challenging the military's initial decision to arrest them. What they are suing over is whether they were tortured by private contractors after being taken into custody. The reasoning behind the military's initial decision to detain Plaintiffs remains unrelated to the Defendants' alleged actions afterwards. Indeed, since the prohibition against torture is "a norm from which no derogation is permitted," *Siderman de Blake*, 965 F.2d at 714, the basis for Plaintiffs' capture is irrelevant. Even if they were not "innocent Iraqis," they should still not have been subjected to the treatment that they allege.

The other legal standards necessary for resolving this case do not create a political question. In *Tiffany*, for example, the court held it could not set standards for what constituted reasonable and prudent conduct in initiating an aerial intercept of an unidentified plane, since this was both wholly outside of the court's expertise and wholly within that of the military. 931 F.2d at 278-79. The military was also found to have had discretion to respond to the situation as it developed and was not bound by any set standard or concrete guidelines which the court could apply in lieu of creating its own standard. *Id.* at 279-82. In contrast, unlike *Tiffany*, this case is about the actions of a private company and its employees. While the events may have occurred in a warzone, Defendants are alleged to have acted independently of the Government, meaning that there were "no military orders or procedures" governing Defendants' acts which place the determination of liability "outside of the capacity of this court." *Potts*, 456 F. Supp. 2d at 1253.

Deriving the appropriate legal standard for torts such as those claimed here is a task well within the Court's competence. A body of caselaw exists for evaluating such claims, and it is a conventional task of courts to draw upon this law to determine the standards which will ultimately guide a jury. *See, e.g.*, *Ford v. Garcia*, 289 F.3d 1283, 1287-94 (11th Cir. 2002) (evaluating appropriate legal standards for Alien Tort Statute case alleging torture and murder); *Hilao v. Estate of Marco*, 103 F.3d 767, 778-82 (9th Cir. 1996) (discussing appropriate standards and jury instructions in tort suit for torture and other human rights abuses); *Kadic v. Karadzic*, 70 F.3d 232, 249 (2nd Cir. 1995) ("[U]niversally recognized norms of international law provide judicially discoverable and manageable standards for adjudicating suits brought under the Alien Tort [Statute], which obviates any need to make initial policy decisions of the kind normally reserved for nonjudicial discretion.").

As for discovery concerns, it is premature to dismiss the case as involving political questions on the chance that discovery may bump up against issues of confidentiality. First, the state secret doctrine, which allows for dismissal of suits which would expose classified government information, "must be asserted by the United States." *El-Masri v. United States*, 479 F.3d 296, 304 (4th Cir. 2007) (citing *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953)). "It belongs to the Government and can neither be claimed nor waived by a private party." *Id.* (quotation marks and ellipses omitted). "[T]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter." *Id.* "[T]he department head's formal privilege claim may be made only after actual personal consideration by that officer." *Id.* (quotation marks omitted). "[T]he state secrets privilege is not to be lightly invoked, and the foregoing constraints on its assertion give practical effect to that principle." *Id.* (quotation marks omitted). In the present case, the Government had not made any such claim, nor has it filed a

Statement of Interest in the suit.  *See* 28 U.S.C. § 517.  In light of the fact that the power to invoke this privilege belongs to the Government alone and the admonition that the state secret doctrine should not in any event be lightly invoked, the Court declines to dismiss the case on the hypothetical possibility that classified information may be pertinent.  *See Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1513 (D.C. Cir. 1984) (advising that "[i]t is premature to conclude that essential evidence is undiscoverable merely on the basis of the complaint and related declarations"), *dismissed as moot* 788 F.2d 762 (D.C. Cir. 1986).  Plaintiffs indicate that much of the evidence they need is either unclassified or outside the control of the Government, such as eyewitness testimony.  Without a more substantive showing as to the dangers of going forward, it is too early at this point to conclude that theoretical discovery problems will make the case so unmanageable that it must be dismissed without further proceedings.

## V.  Whether Defendants Have Immunity from Suit

Defendants submit that they are possessed of two types of immunity from this suit: derivative sovereign immunity and government contractor immunity.  The Court considers their arguments.

## A.  Derivative Sovereign Immunity

Defendants claim that their duties in Iraq and their relationship with the military effectively place them in the shoes of the sovereign and therefore entitle them to derivative sovereign immunity.  "[C]ontractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity."  *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000).  Where "authority to carry out the project was validly conferred . . . there is no liability on the part of the contractor for executing [the Government's] will."  *Yearsley v. W.A. Ross Constr. Corp.*, 309 U.S. 18, 20-21 (1940); *Arango v. Guzman*

*Travel Advisors Corp.*, 621 F.2d 1371, 1379 (5th Cir. 1980) (when operating "merely as an arm or agent of the . . . government in carrying out [an] assigned role," contractors are "entitled to the same immunity from any liability arising from that governmental function as would inure to the government, itself"); *Adams v. Alliant Techsystems, Inc.*, 201 F. Supp. 2d 700, 708 (W.D. Va. 2002) (Government "has the right to employ servants to do [its] work, and those servants cannot be sued where they act strictly in the line of their employment executing the orders of the United States").

This "defense shields federal contractors from liability for actions that are tortious when done by private parties but not wrongful when done by the government." *United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1146 (9th Cir. 2004). Accordingly, where the authority to act is "limited by statute, [] actions beyond those limitations are considered individual and not sovereign actions." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). In such cases, the actor "is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden." *Id.* Thus, "[w]here an agent or officer of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be either that he exceeded his authority or that it was not validly conferred." *Yearsley*, 309 U.S. at 21. And, "[w]here a private contractor acts independently of precise directions and approvals, . . . the defense is unavailable." *Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 540 (M.D.N.C. 2008). "The level of governmental control required is significant; merely providing general direction while leaving the implementation to others will not suffice." *Id.*

The Fourth Circuit applied the principle of derivative sovereign immunity in *Butters v. Vance International, Inc.* 225 F.3d at 466. Plaintiff Butters was a private security guard for Vance International, which provided private security services for Saudi Arabian royalty in the United States. *Id.* at 464. Butter's supervisors recommended her for a command position in the security detail assigned to the Saudi's U.S. residence. *Id.* The company did not award her the new position, however, because the Saudis, due to religious and cultural beliefs, did not want a woman serving in a high ranking security position. *Id.* Butters sued Vance for gender discrimination. *Id.* Vance claimed immunity from suit on the ground that it had derivative foreign sovereign immunity.[8] *Id.* at 466. The Fourth Circuit agreed. *Id.* "All sovereigns need flexibility to hire private agents to aid them in conducting their governmental functions." *Id.* "To abrogate immunity would discourage American companies from entering lawful agreements with foreign governments and from respecting their wishes even as to sovereign acts." *Id.* Since Vance was following the directions of Saudi Arabia in discriminating against Butters, "imposing civil liability on the private agents of Saudi Arabia would significantly impede the Saudi government's sovereign interest in protecting its leaders while they are in the United States." Even so, the court twice noted that it was critical to its decision that Vance was acting under the direction of Saudi Arabia. The court said that "[i]f Vance was following Saudi Arabia's orders not to promote Butters, Vance would be entitled to derivative immunity," but that if "Vance, not Saudi Arabia, actually made the decision not to promote Butters . . . [then] Vance would not be entitled to derivative immunity." *Id.* at 467. Dismissal was ultimately deemed appropriate since "the evidence . . . establishe[d] that the Saudi military officers, Colonel Mohammed and Captain

---

[8] While *Butters* dealt with derivative foreign sovereign immunity as opposed to derivative U.S. sovereign immunity, the Fourth Circuit recognized that both doctrines rely on the same legal principles and used the law of derivative U.S. sovereign immunity to define derivative foreign sovereign immunity. 225 F.3d at 466. *Butters* is therefore instructive as to the applicability of both doctrines.

Abdullah, decided not to promote Butters." *Id.* at 467; *see also Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp 379, 385 (S.D. Tex. 1994) (contractor alleged to have falsely detained Saudi prince's servants had derivative immunity where he "merely repeated" order from prince not to let servants leave hotel), *aff'd*, 79 F.3d 1145 (5th Cir. 1996).

Here, on the other hand, relying on the information in the Complaint, it is clearly too early to dismiss Defendants on the basis of derivative sovereign immunity. *See Schrader v. Hercules, Inc.*, 489 F. Supp. 159, 161 (W.D. Va. 1980) (stating that determinations of derivative sovereign immunity are best handled on summary judgment or at trial by the finder of fact, not on a motion to dismiss, since it is difficult to determine the scope of a defendant's employment with the Government based on no more than a complaint). Plaintiffs' Complaint posits that Defendants were not operating under the authority of the Government in committing the alleged acts of torture, but were instead acting of their own volition. If Defendants are found to have been acting outside the scope of their contracts and not on behalf of the sovereign when they committed the allegedly tortious acts, then they would not be entitled to derivative sovereign immunity.

Since the contract between L-3 and the military is not before the Court at this time, determining both the scope of the contract and whether that scope was exceeded is not possible. Information such as "[d]efendants' contract with the government will shed much light on the responsibilities, limitations and expectations that [d]efendants were bound to honor as government contractors." *Al Shimari v. CACI Premier Technology, Inc.*, 657 F. Supp. 2d 700, 717 (E.D. Va. 2009). Additionally, "consideration of Defendants' course of dealing with the government may reveal whether deviations from the contract occurred and, if so, whether they

were tolerated or ratified." *Id.* This issue must await further discovery before the Court is in a position to judge.

In any event, assuming Defendants can eventually show that they were acting within the scope of their employment, the Court would still need to consider whether the authority to commit the alleged acts of torture was "validly conferred." *Yearsley*, 309 U.S. at 21. Derivative sovereign immunity does not mean that any action taken by a contractor working for the Government is automatically immunized. This doctrine recognizes that there are many things the Government can lawfully do which a private party normally cannot. In *Yearsley*, for example, defendant contracted with the Government to build dikes along a river. *Id.* at 19-20. Defendant intentionally directed the water current so it would erode away ninety-five acres of plaintiff's land alongside the river to open up the channel and improve river navigation. *Id.* The court held that this activity was lawful for the Government to undertake in light of legislation allowing the Government to improve river navigation and the Government's taking power. *Id.* No doubt, if some other private party intentionally destroyed ninety-five acres of plaintiff's property, that party would be liable for a tort. But because the private party in *Yearsley* was working on behalf of the Government, and the Government could have rightfully washed away the land, Defendant was held not liable. *Id.*

Here, if the Court finds that the alleged tortious acts were within the scope of Defendants' contract, Defendants would only be immune if the sovereign's authority to commit those acts is not "limited by statute" or otherwise "forbidden" by law. *Larson*, 337 U.S. at 689. If the Government would have been lawfully allowed to carry out the actions alleged in this case, then it could delegate that power to Defendants. But if, by its own laws, the sovereign could not lawfully take these actions on its own, it could not delegate the task to a private contractor. In

light of the many prohibitions against torture, Defendants will have to show (and they would seem to face a challenge to do so) that their actions were nevertheless lawful for the Government, else they will be deemed "individual and not sovereign actions" and not immunized. *Id.*

Mangold v. Analytic Services. Inc.*, cited in Defendants' briefs, does not undermine these conclusions. 77 F.3d 1442 (4th Cir. 1996). *Mangold*'s grant of immunity was based on a combination of derivative absolute official immunity and witness immunity, doctrines that differ from derivative sovereign immunity. Derivative sovereign immunity protects agents of the sovereign from liability for carrying out the sovereign's will. Derivative absolute official immunity ensures that discretionary governmental decision makers are able to efficiently exercise their discretion in the best interests of the Government without "the potentially debilitating distraction of defending private lawsuits." *Id.* at 1446. Even if Defendants had raised a derivative absolute official immunity defense, and even if it might potentially be applicable here, it would still be denied at this stage for the same reason that the derivative sovereign immunity defense is denied. Among other things, derivative absolute official immunity requires that Defendants be found to have acted "within the scope of their employment." *Id.* Without more information as to Defendants' contract and their duties vis-à-vis the Government – information which discovery should reveal – it would be premature to dismiss based on that ground. As for witness immunity, the other basis for the grant of immunity in *Mangold*, that defense ensures that people who testify as witnesses or aid in investigations are not deterred from being candid and open is disclosing what they know. *Id.* at 1448-49. It is irrelevant to this case since there is no contention by either party that Defendants' liability arises out of their testifying or cooperating with investigators.

**B. Government Contractor Immunity**

Defendants contend that they are entitled to government contractor immunity against state law claims since they were integrated into combat activities over which the military retained command authority during wartime. The Court recognizes that this defense was recently applied by the United States Court of Appeals for the District of Columbia Circuit in *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009).

As an initial matter, Plaintiffs argue that Defendants did not raise this defense in their Motions to Dismiss and that the Court should therefore not consider it at all. The Court, however, expressly invited the parties to brief the *Saleh* decision, and Plaintiffs did not object to this invitation. Both parties have submitted briefs, reply briefs, and supplemental briefs on the issue. The matter has therefore been sufficiently developed for the Court to decide it.

The decision in *Saleh* arose out of the Supreme Court's decision in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). In *Boyle*, a military pilot drowned when his helicopter crashed in water and he was unable to open the cockpit escape hatch and get out of the helicopter. *Id.* at 503. The pilot's family sued the manufacturer claiming that the hatch was defectively designed and won a jury verdict against the manufacturer. *Id.* The Supreme Court eventually held that the state tort claims brought by the family were preempted. *Id.* at 511-512. The Court deemed two considerations appropriate in determining whether to preempt the claims. *Id.* at 506-07. First, a "uniquely federal interest" must be at stake, *id.* at 504, and second, state tort law should not apply where "a significant conflict exists between an identifiable federal policy or interest and the operation of state law or the application of state law would frustrate specific objectives of federal legislation." *Id.* at 507 (quotation marks, brackets, and citations omitted).

The *Boyle* Court determined that procuring military equipment from private contractors constituted the uniquely federal interest. *Id.* at 506-07. "The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price." *Id.* at 507. "Either way, the interests of the United States will be directly affected." *Id.*

As for the second consideration, the Court noted that the duty imposed by state law which is the "basis of the contractor's liability (specifically, the duty to equip helicopters with the sort of escape-hatch mechanism petitioner claims was necessary) is precisely contrary to the duty imposed by the Government contract (the duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications)." *Id.* at 509. Articulating a guiding principle to determine when state tort law conflicts with federal interests, the Court referred to "a statutory provision that demonstrates the potential for, and suggests the outlines of, 'significant conflict' between federal interests and state law in the context of Government procurement," namely, the Federal Tort Claims Act (FTCA). *Id.* at 511 (discussing 28 U.S.C. § 2671 *et seq.*). Under the FTCA, which generally waives sovereign immunity for suits against the Government, there is an exception which precludes any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* (quoting 28 U.S.C. § 2680(a)).

As the Supreme Court saw it in *Boyle*, while the FTCA explicitly says it does not apply to government contractors, 28 U.S.C. § 2671, the policies behind the "discretionary function" exception to the FTCA are relevant as a basis for immunizing contractors because Government procurement of equipment requires "not merely engineering analysis but judgment as to the

balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *Id.* at 511. "It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production." *Id.* at 512.

To ensure, however, that the scope of displacement is no broader than necessary while still serving its purpose, the Court in *Boyle* developed a three part test to determine whether a conflict in fact exists. *Id.* at 512. Liability will not be imposed on a contractor where "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512-13.

*Saleh* arose on facts similar to the case at bar and involved some of the same parties and counsel. 580 F.3d at 2. A group of Iraqis who had been detained at Abu Ghraib sued military contractors who provided translation and interrogation services, including L-3 (then known as Titan Corp.), for allegedly torturing them while in military custody. *Id.* at 2-3. The court, drawing upon *Boyle*, determined that plaintiffs' state law claims were preempted. *Id.* at 5. But, whereas the Supreme Court in *Boyle* had looked to the "discretionary function" exception in the FTCA for the policy underlying contractor immunity, the D.C. Circuit in *Saleh* determined that it should apply the policy underlying a different exception in the FTCA, namely that which precludes "any claim arising out of the combatant activities of the military or armed forces, or the Coast Guard, during time of war." *Id.* at 6 (quoting 28 U.S.C. 2680(j)).

While the *Saleh* court did not expressly define the unique federal interest at stake, some of the language used to discuss the conflict suggests that it viewed the interest as the Federal

Government's general ability to wage war.  *Id.* at 6, 7.  The court also assumed without

discussion that defendants' interrogation and interpretation duties were "combatant activities" as

that term is used in the FTCA.  *Id.* at 6.  Then, weighing whether there was a significant conflict

between the federal interest and that of state tort law, the court concluded that "the policy

embodied by the combatant activities exception is simply the elimination of tort from the

battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free

military commanders from the doubts and uncertainty inherent in potential subjection to civil

suit."  *Id.* at 7.  "[T]he policies of the combatant activities exception are equally implicated

whether the alleged tortfeasor is a soldier or a contractor engaging in combatant activities at the

behest of the military and under the military's control."  *Id.*

The court sought to distinguish the nature of the conflict in the case before it from that in

*Boyle*, which was "a sharp example of discrete conflict in which satisfying both state and federal

duties . . . was impossible."  *Id.*  The *Saleh* court said that "the instant case presents us with a

more general conflict preemption, to coin a term, 'battle-field preemption': the federal

government occupies the field when it comes to warfare, and its interest in combat is always

'precisely contrary' to the imposition of a non-federal tort duty."  *Id.*

The *Saleh* court then distilled its holding into a rule that "[d]uring wartime, where a

private service contractor is integrated into combatant activities over which the military retains

command authority, a tort claim arising out of the contractor's engagement in such activities shall

be preempted."  *Id.* at 9.  Because of this new rule, the court determined that all claims against

the defendants should have been dismissed.  *Id.* at 13.

This Court declines to follow the D.C. Circuit's decision.[9]  The grant of immunity outlined in *Boyle* was limited to the principles underlying the "discretionary function" exception to the FTCA; in no sense did it suggest that all of the FTCA exceptions should be incorporated into government contractor immunity.  The combatant activities exception fails to take into account the requirement that the Government must play a role in the alleged tortious conduct, which the Supreme Court found to be the basis for immunizing contractors working for the Government.  The discretionary function test protects the Government from activities occurring within the scope of a contractor's engagement.  But there was and is no need to craft a new rule that immunizes a contractor's rogue operations.

As observed, when considering preemption, a court must first define the uniquely federal interest at stake.  In *Boyle*, the core interest was deemed to be procuring military equipment from private contractors.  Notably, the court did not cite some other, broader interest such as the Government's need to train its soldiers or the need to operate the military in the best interests of national defense.  Applying that core finding to this case, the uniquely federal interest here is more appropriately framed as the need to procure services for the military from private contractors.  *Saleh*'s suggestion that the interest is the Government's need to have the power to wage war paints with too broad a brush.

As for how to define the conflict between the federal and state interests, *Boyle* relied only on the "discretionary function" exception of the FTCA; it did not state that courts should pick and choose whichever FTCA exception they feel is most appropriate to the cases before them or should apply each exception in turn to see if any suggests a conflict.  *See McMahon v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315, 1330 (M.D. Fla. 2006) (refusing to apply

---

[9] The Court notes that the majority opinion in *Saleh* was issued over a vigorous and well-reasoned dissent by Judge Garland, 580 F.3d at 17, which informs in part this Court's decision not to adopt a government contractor immunity defense based on the combatant activities exception to the FTCA.

combatant activities exception to government contractor immunity since "[t]here is no express authority for judicially intermixing the government contractor defense and the combatant activities exception" and suggesting that crafting new defenses like this should be done by Congress), *aff'd*, 502 F.3d 1331 (11th Cir. 2007).

In this Court's view, other Supreme Court jurisprudence dealing with preemption of state law supports holding government contractor immunity to its original moorings in the discretionary function exception of the FTCA. A fundamental assumption in preemption law is that traditional areas of state power, such as tort law, are not preempted "unless that [i]s the clear and manifest purpose of Congress." *Wyeth v. Levine*, 129 S. Ct. 1187, 1194-95 (2009). Courts apply this assumption "because respect for the States as 'independent sovereigns in our federal system' leads us to assume that 'Congress does not cavalierly pre-empt state-law causes of action.'" *Id.* at 1195 n.3 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). And, "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 167 (1989) (brackets in original, quotation marks omitted).

Congress has shown its awareness of the matter of whether private contractors should be subject to suit while working for the federal Government by expressly removing them from the FTCA's ambit of protection. Likewise, in some very specific cases, Congress has created special provisions which allow contractors to seek the protection of the FTCA. *See, e.g.*, 50 U.S.C. § 2783 (applying FTCA protections to contractor defendants in suits arising out of "exposure to radiation based on acts or omissions by a contractor in carrying out an atomic weapons testing

program under a contract with the United States").  The overarching decision to remove

contractors from the protective ambit of the FTCA, subject to a few well defined exceptions,

indicates that Congress has been prepared to allow most tort suits against government contractors

to proceed and at the very least counsels caution in determining whether to extend their

immunity.  In suits which challenge a clearly discretionary decision of the Government which

was simply carried out by a contractor, such as in *Boyle*, the conflict between the federal interest

and the state law is substantial enough that preemption is warranted.  In contrast, based on the

combatant activities exception, a tort suit will not necessarily implicate any actions of the

Government.  Indeed, in a case such as the present one, Plaintiffs allege that Defendants

committed the tortious acts without the authorization of the Government and contrary to the law

and policies of the military, the nation, and the international community.  In such cases, the

contractors are not seen as doing the Government's bidding and the actions of the federal

Government cannot be said to have played a role in the alleged torts.  The result is an absence of

tension between state tort law and the Government's interest in using contractors.

There is a further reason why the Court is not persuaded by the rationale of *Saleh* and its

reading of *Boyle*.  *Boyle* expressly rejected as a basis for government contractor immunity

defendant's reliance on the *Feres*-doctrine, which precludes suits against the Government for

injuries to Armed Services personnel in the course of military service.  487 U.S. at 510

(discussing *Feres v. United States*, 340 U.S. 135 (1950)).  In part, the *Boyle* Court rejected the

*Feres*-doctrine as a basis for the defense because it does not take into account whether the

Government exercised any discretion or played any role in the contractor's alleged tortious acts,

as required by the three part test ultimately articulated in *Boyle*.  *Id.*  As the Supreme Court saw

it, under the *Feres*-doctrine suits which do not implicate any decisions by the Government and

which rest solely on the private contractor's tortious conduct would also be improperly

dismissed. *Id.* Such an application of government contractor immunity would be "too broad."

*Id.* This Court believes that using the combatant activities exception as a basis for government

contractor immunity would result in the same problem as the *Feres*-doctrine, since even

contractors acting directly contrary to the Government's orders would be immunized.[10]

Since using the combatant activities test as a basis for government contractor immunity

goes against the teaching of *Boyle* and the principles of preemption, the Court will not dismiss

the Complaint on that basis.[11]

## VI. Whether Plaintiffs State Valid Claims Under the Alien Tort Statute[12]

Defendants have moved to dismiss all of Plaintiffs' claims brought under the Alien Tort

Statute ("ATS") on the ground that ATS causes of actions do not apply to private parties, only to

state actors, and that Defendants are not state actors. Alternatively, if the Court holds that

---

[10] The few cases which have indicated the combatant activities exception is an appropriate basis for government contractor immunity have not gone so far as *Saleh* and have instead recognized, that to have conflict, the Government must have played some role in the tort. In *Koohi v. United States*, for example, an Iranian passenger jet was shot down by a U.S. naval vessel which mistook the plane for a combat aircraft during the 1984-1988 "Tanker War" in the Persian Gulf. 976 F.2d 1328, 1330 (9th Cir. 1992). The estates of the passengers sued the contractor which manufactured the missile system. *Id.* The Ninth Circuit dismissed the case under the combatant activities exception, assuming that *Boyle* had meant to incorporate all of the FTCA exceptions into government contractor immunity. *Id.* at 1336. The court declared that "one purpose of the combatant activities exception is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." *Id.* at 1337. As stated above, this Court does not believe that *Boyle* intended to adopt the combatant activities test. But, at the very least, the court in *Koohi* recognized that the allegedly tortious action must have been "directed" and "authorized" by the military. Here, there is no claim that the force was either directed or authorized by the military. To the contrary, Plaintiffs allege that Defendants' actions were unauthorized and hidden from the military.

[11] The Court notes that *Saleh* was also dismissed on a broader field preemption rationale suggesting that the state law claims would infringe upon traditional "federal wartime policy-making." 580 F.3d at 11. While the Court is not convinced that the field preemption defense discussed in *Saleh* comports with established precedent, *see Saleh*, 580 F.3d at 24-26, 30-32 (Garland, J., dissenting), the Court would not dismiss at this stage even if it did consider this a potentially valid ground for dismissal. As with the political question issue, *supra* Part IV.A, and as discussed in the Court's consideration of the government contractor immunity defense, Plaintiffs posit that Defendants' alleged actions in this case were taken contrary to the policies of the U.S. Government and the military. If "federal wartime policy-making" was not behind Defendants' alleged actions, then state law claims do not intrude upon the preempted field.

[12] Other courts have referred to this statute as the Alien Tort Claims Act ("ATCA") and the Alien Tort Act ("ATA"). *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979 n.5 (9th Cir. 2007). Since the Supreme Court referred to the statute in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), as the Alien Tort Statute ("ATS"), this Court will also use that name.

private parties are subject to the ATS, Defendant L-3 claims that only natural persons, and not corporate entities, are subject to suit. Defendants also move to dismiss Plaintiffs' ATS counts dealing with cruel, inhuman, and degrading treatment on the ground that cruel, inhuman, and degrading treatment is not a recognized violation of the law of nations and therefore does not constitute a cause of action under the ATS.

## A. Legal Framework for Analyzing Claims Under the Alien Tort Statute

The ATS states in its entirety: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The Supreme Court interpreted the scope and application of the ATS in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). In *Sosa*, a Drug Enforcement Agency ("DEA") agent was tortured and murdered while on assignment in Mexico, and United States authorities suspected that Alvarez played a part in torturing him. *Id.* at 697. The DEA hired a group of Mexican nationals to kidnap Alvarez in Mexico and bring him to the United States. *Id.* The group abducted Alvarez from his home, held him overnight in a motel, and then flew him by private plane into Texas, where federal law enforcement officials arrested him. *Id.* Alvarez was tried for his role in the agent's torture and murder and was acquitted. *Id.* Alvarez then sued, among others, the group which kidnapped him in Mexico on the grounds that holding him overnight before turning him over to authorities constituted arbitrary detention in violation of the law of nations. *Id.* at 698-99. Defendants moved to dismiss on the basis that the particular facts of Alvarez's confinement did not, as a matter of law, show a cognizable violation of the law of nations. *Id.* at 699.

The Court held that the ATS creates no causes of actions but is jurisdictional only, and that federal common law, which incorporates the law of nations, provides the causes of action.

*Id.* at 714.  In the Court's view, a number of factors counseled for caution in recognizing new norms of international law which can serve as the basis for a cause of action.  *Id.* at 725.  These include the limited role common law lawmaking plays in the federal system today, Congress's greater legitimacy in crafting laws, and concerns about adverse foreign policy consequences.  *Id.* at 725-728.  Nevertheless, said the Court, in creating new causes of action "the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today." *Id.* at 729.

In determining new causes of action, "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the ATS] was enacted."  *Id.* at 732.  "Actionable violations of international law must be of a norm that is specific, universal, and obligatory."  *Id.*  (quoting *In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir. 1994)).  To evaluate what the law of nations is

> Where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat.

*Id.* at 734 (brackets omitted) (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)).

Applying these principles to the facts in *Sosa*, the Supreme Court determined that "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment" did not rise to the level of a violation of the law of nations.  *Id.* at 738.  After reviewing treaties, international agreements, and other authoritative sources, the Court held that at minimum, arbitrary detention had to be part of a systematic policy

and had to be prolonged in order to violate the law of nations.  *Id.* at 736-37.  Alvarez's detention was held to fall short of that.  *Id.*

**B.  Whether Private Parties Are Subject to the ATS**

Defendants first contend that private parties are not subject to the law of nations and therefore cannot violate that law.  Plaintiffs take the opposite view.  Private parties, they say, are subject to the law of nations and can be held liable for violations.  Application of the principles espoused in *Sosa* leads this Court to a conclusion in the middle ground: some offenses against the law of nations can be committed by private parties, others require state action.

Some of the earliest cases cognizable under the ATS demonstrate that private parties can be subject to suit for offenses against the law of nations.  When the ATS was enacted in 1789, there were three recognized causes of action: offenses against ambassadors, piracy, and violations of safe conduct.  *Id.* at 720.  All three of these initial causes could be asserted against private parties.  In *Republica v. De Longchamps*, a private citizen threatened and assaulted the French Consul General in Pennsylvania.  1 U.S. 111, 114 (Pa. O. T. 1784).  The Court, in condemning the act, called the incident an "atrocious violation of the law of nations" and referred throughout the opinion to the fact that the assault on an ambassador, by a private individual, was a violation of the law of nations.  *Id.* at 117; *see also Sosa*, 542 U.S. at 716-17 (discussing the *De Longchamps* case).  Indeed, as for piracy, early cases which defined the term expressly required that the offender be a private party.  *United States v. Smith*, 18 U.S. 153, 163, fn.h (1820).  Many authoritative sources noted that among other elements, a pirate acts "without any commission or passport from any prince or sovereign state, solely on his own authority."  *Id.*; *see also Sosa*, 542 U.S. at 732 (citing *Smith* for the definition of piracy).  The law of safe conduct also served to protect against the acts of private parties.  Historically, if an enemy alien

entered a hostile country during time of war, "if the persons or goods of such enemies come into the kingdom, any subject may seize them and gain a property in the goods, as a prize taken in open war." *Nyitray v. McAlonan*, 39 Ohio C.C. 183, 1917 WL 1119, at *2 (Ohio Ct. App. 1917) (quoting *East-India Company v. Sandys*, 36 Car. 2 (1684), *reprinted in* 10 Cobbett's State Trials 371 (1811)). But where a grant of safe conduct had been given, "[n]o subject could seize his goods or injure his person, but he was punishable for it, both at the suit of the king and of the party . . . and [] such an alien enemy may bring his personal action for debt, or any injury." *Id.* (ellipses in original). Indeed, the benefit of safe conduct only made sense insofar as private parties were concerned and not the state, since "this immunity the king was himself not bound to observe." *Id.* at 3. In sum, the fact that the original three causes of action provided under the ATS were applicable against private parties lends force to the conclusion that private parties are not inherently incapable of violating the law of nations.

As to the more modern abusive conduct asserted here, the Supreme Court in *Sosa* noted the issue without deciding it, by saying

> A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual. *Compare Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 791-795 (D.C. Cir. 1984) (Edwards, J., concurring) (insufficient consensus in 1984 that torture by private actors violates international law), *with Kadic v. Karadzic,* 70 F.3d 232, 239-241 (2d Cir. 1995) (sufficient consensus in 1995 that genocide by private actors violates international law).

*Id.* at 732-33, n.20. Notably, in comparing *Tel-Oren* and *Kadic*, the Court took care to differentiate between the particular violations alleged (torture versus war crimes) and the years involved (1984 versus 1995). This suggests that the liability *vel non* of private actors should be considered separately with respect to each individual violation alleged and according to the law of nations as it exists at the time the determination is made. Additionally, the Supreme Court has

stated that "[t]he Alien Tort Statute by its terms does not distinguish among classes of defendants." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 438 (1989) (discussing the interplay between the ATS and the Foreign Sovereign Immunities Act, 28 U.S.C. 1602, *et seq.*). This clearly bolsters the conclusion that the statute makes no distinction between public and private actors and further indicates that each alleged violation should be considered on its own as it exists or does not exist under the law of nations.

The Court considers the various counts of the Complaint against this background.

**1. War Crimes (Counts 7 – 9)**

Counts 7, 8, and 9 of the Complaint allege war crimes, civil conspiracy to commit war crimes, and aiding and abetting the commission of war crimes, respectively.

Instruments of international law, learned treatises, and the weight of judicial opinion suggest that war crimes claims under the ATS can be made against a private party and do not require state action.

To begin, the Geneva Conventions represents a universal, international consensus with respect to what constitute war crimes, and the Fourth Geneva Convention specifically covers treatment of civilians in warzones and occupied territories. *See* Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516 (hereafter "*Fourth Geneva Convention*"). All four Geneva Conventions have been ratified by nearly every country in the world, including the United States and Iraq. U.S. Dep't of State, Treaties in Force 435-437 (2009). The Fourth Geneva Convention does not limit its application based on the identity of the perpetrator of the war crimes. Rather, its protections are based on who the potential victims of war crimes are.[13] *Fourth Geneva Convention*, art. 4. "Persons protected by

---

[13] Defendants claim that the Geneva Conventions only applies to "belligerents" to a conflict, and cite one case, *Kadic*, for this proposition. L-3 Reply at 16-17. The relevant portion of *Kadic*, however, dealt with another section

the Convention are those who, at a given moment and in any manner whatsoever, find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals." *Id.* The Convention goes on to define certain "grave breaches" which constitute war crimes when "committed against persons or property protected by the present Convention." *Id.* at art. 147. These "grave breaches" include "torture or inhuman treatment" and "wilfully causing great suffering or serious injury to body or health." *Id.* That this Convention, which represents the international consensus on war crimes, makes no distinctions between state actors and private actors suggests there in fact there is no distinction, and that private actors as well as public ones are liable for war crimes.

Passage by the United States Congress of the War Crimes Act of 1996, 18 U.S.C. § 2441, further suggests that war crimes are not limited to state actors. This law codified and incorporated international law on war crimes and created criminal penalties for people who commit them. *Id.* at § 2441(c). The law does not provide that non-state actors are exempt from prosecution. In fact, companies employing private civilian contractors operating in foreign countries are specifically required to notify their contractors they could face criminal liability for violations of the War Crimes Act. 48 C.F.R. 252.225-7040(e)(2)(ii). Defendants suggest that this law has no bearing on whether international law extends to private actors since it does not in and of itself create a private civil cause of action. The Court is unpersuaded. True, the law

---

of the Geneva Conventions known as Common Article 3 (since it is contained in all four Geneva Conventions). *See, e.g. Fourth Geneva Convention*, art. 3. Common Article 3 does set standards for conduct by a "party" to a conflict (presumably similar to a "belligerent") and is not phrased in terms of who the potential victim is. But Common Article 3 is inapplicable here since it only applies to an "armed conflict not of an international character." The phrase "international character" refers to conflicts which are literally between nations, such that an "armed conflict not of an international character" could include a civil war or a conflict between a country and a non-state terrorist organization. *See Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) (determining that the conflict between the United States and Al-Qaida is not an "international" conflict, as that term is used in Common Article 3, since Al-Qaida is not a nation). The conflict here is international since, at least in its inception, it involved two separate nations, the United States and Iraq. Thus, this case is governed by the remaining provisions of the Geneva Conventions which are structured around the potential victim of the war crimes and not the potential perpetrator.

creates no private cause of action.  However, it remains useful as a guide to understanding how

the law of nations treats war crimes.  Since Congress enacted the law in order to comply with

certain obligations of the Geneva Convention, *see Fourth Geneva Convention*, art. 146, the

substantive aspects of the law are appropriately viewed as reflecting the law of nations.  Thus,

Congress's decision not to limit the War Crimes Act to state actors is a strong indication that the

law of nations related to war crimes makes no such distinction.  *Compare* War Crimes Act of

1996, 18 U.S.C. § 2441 (no requirement of state action for war crimes prosecution), *with* Torture

Victim Protection Act of 1991, 28 U.S.C. § 1350, statutory note, sec. 2(a) (requiring that torture

be committed by someone who acts "under actual or apparent authority, or color of law, of any

foreign nation").

This view accords with the Restatement (Third) of Foreign Relations Law of the United

States (1987), which states

> In the past it was sometimes assumed that individuals and corporations,
> companies or other juridical persons created by the laws of a state, were not
> persons under (or subjects of) international law.  In principle, however,
> individuals and private juridical entities can have any status, capacity, rights, or
> duties given them by international law or agreement, and increasingly individuals
> and private entities have been accorded such aspects of personality in varying
> measures. . . .  *Individuals may be held liable for offenses against international
> law, such as piracy, war crimes, or genocide.*

*Id.*, at pt. II, intro. note (footnotes and citations removed, emphasis added).  The Restatement

goes on to include war crimes among those offenses against the law of nations which are of

"universal concern," and recites many of the other offenses which private parties can commit,

including piracy, slavery, aircraft highjacking, and assaults on diplomatic personnel.  *Id.* at §

404, cmt. a.[14]  The Restatement's classification of war crimes as an offense of universal concern,

---

[14] While § 404 of the Restatement speaks mainly in terms of criminal punishment for offenses of universal concern,
it also notes that "international law does not preclude the application of non-criminal law on this basis, for example,
by providing a remedy in tort."  *Id.* at cmt. b.  The ATS does just that.

and its determination that "[i]ndividuals may be held liable for offenses against international law, such as . . . war crimes," stands in sharp contrast to the other offenses the Restatement describes as requiring state action. *See id.* at § 702; *see also Kadic*, 70 F.3d at 240 (discussing the Restatement's differentiation between law of nations violations of universal concern and violations requiring state action).

Judicial decisions in other ATS cases confirm that non-state actors may be held liable for war crimes. *Kadic v. Karadzic* was one of the first cases to recognize that non-state actors could be liable for war crimes, and forms the basis for many of the subsequent opinions allowing war crimes claims to proceed against private parties. [15]  70 F.3d 232 (2nd Cir. 1995). *Kadic* arose out of the civil war in Bosnia-Herzegovina, in which Karadzic, as the leader of the self-proclaimed and unrecognized Republic of Srpska, attempted to secede from Bosnia-Herzegovina. *Id.* at 236-37. Plaintiffs there alleged that during the civil war, military forces under the control and direction of Karadzic engaged in numerous violations of the law of nations, including war crimes, torture, and infliction of cruel, inhuman, and degrading treatment. *Id.* Karadzic argued that the ATS claims were not assertable against him since he was a private individual, not a state actor, and therefore not bound by the law of nations. *Id.* at 239.

After reviewing many of the same sources of law considered here, the Second Circuit recognized that "certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." *Id.* at 239. "The liability of

---

[15] While *Kadic* was decided pre-*Sosa*, the methodology and reasoning applied in analyzing the law of nations in that case is the same which *Sosa* ultimately adopted. The *Kadic* Court presciently determined that "courts ascertaining the content of the law of nations must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." *Id.* at 238 (quotation marks omitted). "[T]he norms of contemporary international law" are found "by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law." *Id.* (quotation marks omitted). Further, *Sosa* acknowledged that other Second Circuit precedent which informed the decision in *Kadic*, such as *Filartiga v. Pena-Irela*, 630 F.2d 876 (2d Cir. 1980), had adopted what the Court deemed the proper approach for evaluating the law of nations under the ATS. 542 U.S. at 731, 732.

private individuals for committing war crimes has been recognized since World War I and was

confirmed at Nuremberg after World War II, and remains today an important aspect of

international law." *Id.* at 243 (citation omitted). In light of this holding, the court determined

that the case could proceed on a theory of war crimes without regard to whether Karadzic was a

state actor.[16] *Id.; see also Sinaltranal v. Coca-Cola,* 578 F.3d 1252, 1267 (11th Cir. 2009)

("[t]he war crimes exception dispenses with the state action requirement for claims under the

ATS," such that "[s]ome acts, such as torture and murder committed in the course of war crimes,

violate the law of nations regardless of whether the perpetrator acted under color of law of a

foreign nation or only as a private individual"); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 173 (2d

Cir. 2009) ("ATS claims may sometimes be brought against private actors, and not only state

officials, when the tortious activities violate norms of 'universal concern' that are recognized to

extend to the conduct of private parties - for example, slavery, genocide, and war crimes.")

(citation omitted); *Doe I v. Unocal Corp.*, 395 F.3d 932, 945 (9th Cir. 2002)[17] (stating that

"crimes like rape, torture, and summary execution, which by themselves require state action for

[ATS] liability to attach, do *not* require state action when committed in furtherance of other

crimes like slave trading, genocide or war crimes, which by themselves do not require state

action for ATCA liability to attach") (emphasis in original); *In re XE Services Alien Tort

Litigation*, 665 F. Supp. 2d 569, 585, (E.D. Va. 2009) ("[D]efendants offer no basis to conclude

that war crimes claims under the ATS are cognizable only against state actors"); *Estate of

Rodriquez v. Drummond Co.*, 256 F. Supp. 2d 1250, 1260 (N.D. Ala. 2003) ("[C]ourts

---

[16] Defendants here claim that Karadzic was a state actor since he was head of a de facto country, and that *Kadic* therefore does not actually stand for the proposition that there is no state action requirement for war crimes. That reading of the case does not hold up in light of *Kadic*'s unambiguous statements that private, non-state actors may be sued for war crimes under the ATS.

[17] *Doe I* was vacated pending rehearing *en banc*, 395 F.3d 978 (9th Cir. 2003), but the rehearing was never held due to a joint agreement by the parties to dismiss, 403 F.3d 708 (9th Cir. 2005).

interpreting the [ATS] have found that certain forms of conduct - piracy, the slave trade, slavery and forced labor, aircraft hijacking, genocide, and war crimes - violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals.") (quotation marks omitted); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 306 (S.D.N.Y. 2003) (holding that "*jus cogens* violations may entail not only state but individual responsibility" such that "it is well-established in the post-World War II world that individuals may be held liable for acts of genocide, war crimes, or torture"); *Sarei v. Rio Tinto PLC*, 221 F. Supp. 2d 1116, 1144 n.122 (C.D. Cal. 2002) ("War crimes are actionable under the [ATS] without regard to state action."), *aff'd in part, rev'd in part on other grounds*, 487 F.3d 1193 (9th Cir. 2007), *aff'd on remand*, 650 F. Supp. 2d 1004 (C.D. Cal. 2009).

The Court also notes that certain cases cited by Defendants, including *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774 (D.C. Cir. 1984) (Edwards, J., concurring), *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), and *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), do not dispose upon the issue of whether private individuals can commit war crimes. While these three decisions determined that private individuals, as of the dates of their rendering, could not be held liable for torture by reason of the law of nations, none of the three evaluated how claims of war crimes should be treated under the law of nations. Indeed, *Saleh* expressly noted that it dealt only with torture and not war crimes and that the assertability *vel non* of war crimes against private actors might be different, saying

> Even if torture suits cannot be brought against private parties - at least not yet - it may be that "war crimes" have a broader reach. Of course, we reiterate that [plaintiffs] have not brought to our attention any specific allegations of such behavior. Presumably for this reason, when the district court considered [plaintiffs'] ATS argument, it analyzed only an asserted international law norm against torture, not war crimes.

*Saleh*, 580 F.3d at 15, n.13.

The weight of authority thus shows that a claim of war crimes may be asserted against private actors apart from any of state action. And, as the Fourth Geneva Convention provides, war crimes can include "torture or inhuman treatment" and "wilfully causing great suffering or serious injury to body or health." *Fourth Geneva Convention*, art. 147. Accordingly, Plaintiffs' war crimes causes of action (Counts 7 – 9), premised as they are upon the acts of torture and mistreatment they allegedly suffered at the hands of Defendants, are properly asserted against Defendants as private actors.

## 2. Torture and Cruel, Inhuman, and Degrading Treatment (Counts 1 – 6)

Unlike war crimes (including war crimes claims based on acts of torture), independent claims of torture and cruel, inhuman, and degrading treatment ("CIDT") require state action or must be committed under color of law.

Many of the international agreements and conventions dealing with torture and CIDT speak in terms of actions committed by state actors or persons acting under color of law. *See, e.g.*, The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 34 I.L.M. 590 (1995); Declaration on the Protection of All Persons from Being Subjected to Torture, G.A. Res. 3452, 30 U.N. GAOR Supp. (No. 34) at 91, U.N. Doc. A/1034 (1975). The Restatement (Third) of Foreign Relations Law of the United States places torture and CIDT among the offenses which must be undertaken by state actors or those acting under color of authority. *See* Restatement (Third) of Foreign Relations Law of the United States §§ 207, 702, cmt. b.

That liability for torture and CIDT extends only to those who are state actors or who act under color of law is confirmed by domestic statutes dealing with torture. In implementing its obligations under the Convention Against Torture and Other Cruel, Inhuman or Degrading

Treatment or Punishment, Congress passed 18 U.S.C § 2340, which defines torture as, among other elements, requiring "an act committed by a person acting under the color of law." *Id.* at § 2340(1). Likewise, the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350, statutory note, which creates a civil cause of action for torture, requires that the torture be committed by someone acting "under actual or apparent authority, or color of law." Congress's choice to include "color of law" requirements in these laws dealing with international torture stands in marked contrast to the War Crimes Act, 18 U.S.C. § 2441, which contains no such provision limiting who can commit war crimes, and also indicates that under the law of nations torture requires some aspect of state action.

Judicial decisions further confirm that torture, under the law of nations, can only be committed by either state actors or those who act under the color of law. *Kadic* recognized this distinction, since in addition to examining the law of nations regarding war crimes, the Second Circuit also discussed torture, stating that "torture and summary execution - when not perpetrated in the course of genocide or war crimes - are proscribed by international law only when committed by state officials or under color of law." 70 F.3d at 243. In undertaking its color of law analysis, the *Kadic* court drew upon the color of law jurisprudence of 42 U.S.C. § 1983, the general federal civil rights statute, as "a relevant guide to whether a defendant has engaged in official action" and held that defendant in that case had in fact acted under color of law for purposes of plaintiffs' torture claims. 70 F.3d at 245; *see also Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242, 1247 (11th Cir. 2005) ("State-sponsored torture, unlike torture by private actors, likely violates international law and is therefore actionable under the [ATS]."); *Doe I*, 395 F.3d at 946 (determining that "acts of rape, torture, and summary execution, like most crimes, are proscribed by international law only when committed by state officials or under color

of law") (quotation marks omitted); *Filartiga v. Pena-Irala*, 630 F.2d 876, 878 (2d Cir. 1980)

("[D]eliberate torture perpetrated under color of official authority violates universally accepted

norms of the international law of human rights."); *Bowoto v. Chevron Corp.*, 557 F. Supp. 2d

1080, 1092 (N.D. Cal. 2008) (holding that "it is not necessary for plaintiffs to prove that the

torture was committed in accordance with official Nigerian policy," but that "plaintiffs must

show that the torture was committed by an official or under color of law").

Plaintiffs here do not suggest that Defendants were state actors; rather, they argue that

Defendants acted under color of law.  The Court tests that proposition.

**(a).  Whether the Defendants Acted Under Color of Law**

In evaluating whether Defendants acted under color of law, the Court looks for guidance

in those areas of the law where color of law analysis is prototypically used, such as the federal

civil rights statute, 42 U.S.C. § 1983.  The requirement under § 1983 that a party act under color

of law clearly excludes from its reach "merely private conduct, no matter how discriminatory or

wrongful."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).  Nevertheless, "the deed

of an ostensibly private organization or individual" may at times demand to be treated "as if a

State has caused it to be performed."  *Brentwood Academy v. Tenn. Secondary Sch. Athletic

Ass'n*, 531 U.S. 288, 295 (2001).  This has been held to occur where "there is such a 'close nexus

between the State and the challenged action' that seemingly private behavior 'may be fairly

treated as that of the State itself.'"  *Id.* (quoting *Jackson v. Metro Edison Co.*, 419 U.S. 345, 351

(1974)).

No specific or precise formula exists for determining when a private party acts under

color of law, but the Fourth Circuit has defined at least some specific situations where such a

finding would be warranted.  *See Mentavlos v. Anderson*, 249 F.3d 301, 313 (4th Cir. 2001).

Thus, a finding would be appropriate where the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* at 311 (quoting *Am. Mfrs. Mut. Ins.*, 526 U.S. at 52). Likewise, state action may be found when the private actor is engaged in a "public function," such that "the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'" *Id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982)). State action has also been found "in circumstances where the private actor operates as a 'willful participant in joint activity with the State or its agents.'" *Id.* (quoting *Brentwood*, 531 U.S. at 296).

It is the "public function" concept that gives the Court pause at this early stage of the proceedings. It is true that simply because "a private entity performs a function which serves the public does not make its acts state action." *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982). Further, a private entity's "significant or even total engagement in performing public contracts" does not make that contractor a state actor. *Id.* at 841. Rather, the test looks at whether the function in question is "a function that has been *traditionally* and *exclusively* reserved to the sovereign." *Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214, 219 (4th Cir. 1993) (emphasis added).

Under this rubric, Defendants' work operating alongside the military as interpreters for non-English speaking captives is fairly classifiable as a public function. Operation of a military force is one of the most basic governmental functions, and one for which there is no privatized equivalent. The Constitution recognizes this in its preamble, stating that one of the purposes of the newly created U.S. Government was to "provide for the common defense." U.S. Const. pmbl. Further, among Congress's eighteen enumerated power, eight of them deal with military and national defense issues. *Id.* at art. I, § 8, cl. 1 ("The Congress shall have power to lay and

collect taxes, duties, imposts and excises, to . . . provide for the common defense . . . of the United States"); *id.* at cl. 11 ("To declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water"); *id.* at cl. 12 ("To raise and support armies"); *id.* at cl. 13 ("To provide and maintain a navy"); *id.* at cl. 14 ("To make rules for the government and regulation of the land and naval forces"); *id.* at cl. 15 ("To provide for calling forth the militia to execute the laws of the union, suppress insurrections and repel invasions"); *id.* at cl. 16 ("To provide for organizing, arming, and disciplining, the militia, and for governing such part of them as may be employed in the service of the United States"); *id.* at cl. 17 (To exercise . . . authority over all places purchased . . . for the erection of forts, magazines, arsenals, dockyards, and other needful buildings").  While certain discreet military tasks, such as translation services in this case, may be delegated to contractors, the military still has need to understand, digest, and act upon information taken from enemy (or suspected enemy) prisoners who speak a language other than English.

Two cases dealing with the interplay between the public function test and the military guide the Court in determining whether Defendants here may have been engaged in a public function.  In *Mentavlos v. Anderson*, the Fourth Circuit considered whether cadets who exercised leadership roles at The Citadel, a private college in South Carolina which operated in a military-like environment, acted under color of law.  249 F.3d 301, 314 (4th Cir. 2001).  For a number of reasons, the court ultimately found that the cadets were not state actors, including the fact that the school's mission did not involve preparing individuals for military service, as opposed to roles as "community leaders," and that students were not actually members of the military and were not required to join the military upon graduation.  *Id.* at 317-318.  The court recognized, however, that its analysis would be different if the case involved private actors at a school or

institution which provided training for people entering the military. *Id.* at 315. The court noted that it had "little trouble accepting that training civilians who have enlisted in the military for military service is fairly characterized as a traditionally sovereign power," but found that the Citadel had not "been delegated the sovereign function of training young men and women for the military." *Id.* at 314, 315. The Fourth Circuit's teaching seems clear. If training individuals to carry out military duties is a public function, then actually working alongside the military to carry out military duties approaches the Government's core power to operate a military, which is to say, it becomes a public function.

*Dobyns v. E-Systems, Inc.* also considered whether a private contractor was carrying out a public function so as to make it a state actor. 667 F.2d 1219, 1220 (5th Cir. 1982). The defendant was hired by the United States to set up a surveillance and monitoring station on the border between Israel and Egypt to ensure that the military forces of the two countries respected a recently signed peace treaty. *Id.* at 1224. The monitors were not equipped for combat, but were only supposed to observe and report any suspected military movement. *Id.* Congress at the time, wary of military involvement abroad, required that the station be operated by civilians instead of the military. *Id.* The Fifth Circuit found that these civilians were performing a combination of "peacekeeping" and "[m]ilitary surveillance," both of which were normally carried out by the military and both of which were therefore public functions. *Id.* at 1225-26. While simply carrying out a government contract overseas was deemed insufficient to trigger a public function, the martial nature of the contractors' duties in that particular circumstance made them a public function. *Id.* at 1227-28.

In the present case, Defendants are alleged to have operated alongside the military, carrying out a military task which likely would have been performed by the military itself under

other circumstances. *See Ibrahim v. Titan Corp.*, 556 F. Supp 2d 1, 5-6 (D.D.C. 2007) (indicating that the Government used contract linguists since "[t]he military could not provide for the large number of linguists that were needed" for the conflicts in Iraq and Afghanistan). In view of this, Defendants' work for the military in Iraq may appropriately be viewed as a public function.[18]

As an alternative basis for finding that Defendants acted under color of law, Plaintiffs have alleged that Defendants conspired with at least some members of the military in committing tortious acts, such that Defendants might also meet the joint action test. By this test, state action "does not require that the defendant be an officer of the State." *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). "[P]rivate persons who willfully participate in joint action with a state official act under the color of law." *Scott v. Greeneville County*, 716 F.2d 1409, 1422 (4th Cir. 1983) (citation omitted). Further, the private actor may be deemed to act under the color of law "notwithstanding the official's immunity from civil liability." *Id.*; *Dennis*, 449 U.S. at 28. Looking to the Complaint in this case, Plaintiffs claim that certain members of the military, indisputably state actors, conspired and acted together with Defendants to commit the alleged acts of torture. *See* Pl.'s Second Am. Compl. ¶¶ 419, 424, 445(d), 450, 456. Taking these allegations as true, as at this stage the Court must, Plaintiffs have properly alleged joint action between Defendants and state actors such that Defendants may be deemed to have acted under color of law. *See, e.g.*, *Jackson v. Pantazes*, 810 F.2d 426, 429-30 (4th Cir. 1987) (private bail

---

[18] The Court notes that in some color of law contexts, there must be a nexus between the indicia of state action and the specific acts comprising the alleged tort. In this case, however, the Court need not decide whether there is such a nexus between the behavior which constitutes the public function (i.e. translation work for the military) and the allegedly unauthorized and illegal behavior which constitutes the tort (i.e. the torturing of detainees). The Fourth Circuit has determined that when a defendant is found to have been performing a public function, such that it has acted under color of law, the defendant "may be held liable as a state actor without the demonstration of a nexus - a connection between the indicia of state action and the specific acts comprising the alleged [tort] - that has been required in other contexts." *Goldstein v. Chestnut Ridge Fire Co.*, 218 F.3d 337, 348 (4th Cir. 2000).

bondsman who was accompanied by police officers when entering and ransacking home to search for bail jumper acted under color of law under joint action theory).

In sum, since Plaintiffs in various ways have properly asserted that Defendants acted under color of law, their ATS claims for torture and CIDT (Counts 1 – 6) may proceed at this time.

**(b). Whether the Determination That Defendants Acted Under Color of Law Necessarily Means That Defendants Have Sovereign Immunity**

Defendants maintain that if they are found to have acted under the color of law such that Plaintiffs' ATS torture and CIDT claims may proceed, then their actions would become official actions of the United States and as a result they would enjoy sovereign immunity. Thus, say Defendants, even if the ATS claims could be deemed viable on the former basis, they would still need to be dismissed on the latter basis. The Court disagrees. A person may have acted under color of law, yet still not have acted in an official capacity so as to gain the benefit of sovereign immunity.

"Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken under color of state law." *United States v. Classic*, 313 U.S. 299, 326 (1941). The Supreme Court long ago accepted that a person may act under color of law even when there is no legal basis or authority for his or her actions. *See Monroe v. Pape*, 365 U.S. 167, 172 (1961) (police officers who conducted warrantless search and arrest acted under color of law even though their actions were illegal under both the U.S. Constitution and the laws of their state), *overruled in part on other grounds by Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 663 (1978). In such cases, the tortious acts occur not because the wrongdoers have acted in an official capacity, but because the wrongdoers have exploited a veneer of perceived authority granted to them under the law to

carry out the wrongful acts. *See United States v. Price*, 383 U.S. 787, 795-96 (1996) (finding that sheriffs and civilians who kidnapped, beat, and murdered civil rights workers acted under color of law but rejecting any requirement "that each offender be an official or that he act in an official capacity").

*Filartiga v. Pena-Irela*, the seminal ATS case, dealt with the torture and murder of a Paraguayan citizen by a police officer. 630 F.2d 876, 878 (2d Cir. 1980). The Second Circuit noted the distinction between official governmental acts and those which occur separately and distinctly under the color of law, stating

> [W]e doubt whether action by a state official in violation of the Constitution and laws of the Republic of Paraguay, and wholly unratified by that nation's government, could properly be characterized as an act of state. Paraguay's renunciation of torture as a legitimate instrument of state policy, however, does not strip the tort of its character as an international law violation, if it in fact occurred under color of government authority.

630 F.2d at 889-890 (citation omitted).

The Supreme Court, in discussing the difference between acts taken in an "official capacity" and those taken "under color of legal authority," recognized the distinction in part "as an effort to circumvent the sovereign immunity doctrine." *Stafford v. Briggs*, 444 U.S. 527, 536 n.6 (1980). The idea that wrongful acts which occur under the color of law are individual in nature and not official may simply be "a legal fiction." *Id.* at 546 (Stewart, J., dissenting). Nevertheless, the practical effect has been to allow such suits to proceed. Were it otherwise, every suit for damages based on actions taken under color of law, such as § 1983 suits and *Bivens* actions,[19] would have to be dismissed on sovereign immunity grounds. And that is why such suits are viewed as being against the defendant in an individual capacity and not an official capacity, even though the alleged bad acts still retain their color of law character. *See DeLong v.*

---

[19] *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

*Internal Revenue Service*, 908 F.2d 966, 1990 WL 101402, at *1 (4th Cir. 1990) (table opinion) (whether suit is against defendant in his official capacity or his individual capacity turns "on whom the plaintiff is seeking to impose liability; in both cases, the official is acting under color of law," but "the defense of sovereign immunity is unavailable to those" sued in their individual capacity); *see also Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) (*Bivens* action "must be brought against [the defendants] in their individual capacities. . . . Because an action against [the defendants] in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity").

Since color of law jurisprudence encompasses individual behavior and not just official behavior, there is no contradiction in finding that Defendants acted under color of law but that their actions were individual and not official actions. Plaintiffs seek redress from private defendants, as opposed to the U.S. Government. That Defendants may have acted under color of law does not trigger sovereign immunity and does not require dismissal on that basis.[20]

## C.  Whether Corporations Are Subject to the ATS

L-3 argues that, regardless of whether private parties who are natural persons are subject to the law of nations, corporate entities are not, and therefore the ATS claims against them must be dismissed. Again the Court disagrees.

There is no basis for differentiating between private individuals and corporations in this respect since "[a] private corporation is a juridical person and has no *per se* immunity under U.S. domestic or international law." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 319 (S.D.N.Y. 2003) (allowing ATS claims to proceed against a private

[20] In a similar vein, Defendants suggest that conspiracies are secretive and therefore cannot occur under color of law. L-3 Reply Mem., at 17-18. This contention fails to take into account cases such as *Tower v. Glover*, 467 U.S. 914, 920 (1984) (recognizing that "an otherwise private person acts under color of state law when engaged in a conspiracy with state officials" and upholding § 1983 claim against criminal defense attorney alleged by former client to have conspired with state prosecutors to secure client's conviction) (quotation marks omitted).

corporation); *see also Romero v. Drummond Corp.*, 552 F.3d 1303, 1315 (11th Cir. 2008) ("The

text of the Alien Tort Statute provides no express exception for corporations, and the law of this

Circuit is that this statute grants jurisdiction from complaints of torture against corporate

defendants.") (citation omitted); *In re XE Services*, 665 F. Supp. 2d at 588 (holding that

"[n]othing in the ATS or *Sosa* may plausibly be read to distinguish between private individuals

and corporations"); *In re Agent Orange Product Liability Litigation*, 373 F. Supp. 2d 7, 59

(S.D.N.Y 2005) (noting that "an ATS claim is a federal common law claim and it is a bedrock

tenet of American law that corporations can be held liable for their torts"). Courts have

"repeatedly treated the issue of whether corporations may be held liable under the [ATS] as

indistinguishable from the question of whether private individuals may be." *Khulumani v.

Barclay Nat. Bank Ltd.*, 504 F.3d 254, 282 (2d Cir. 2007) (Katzmann, J., concurring in *per

curiam* opinion, joined by Hall, J.); *Bowoto v. Chevron Corp.*, 2006 WL 2455752, at *9 (N.D.

Cal. Aug. 22, 2006) (determining that once "an international norm has become sufficiently well

established to reach private actors, there is very little reason to differentiate between corporations

and individuals."). Since the Court has already determined that the law of nations extends to the

parties in this case, they may be held liable regardless of whether they exist in a natural form or a

corporate form.

     The arguments put forth by L-3 for disallowing claims against corporations do not affect

this analysis. L-3 cites the Supreme Court's decision in *Correctional Services Corp. v. Malesko*,

which declined to allow *Bivens* actions to proceed against private corporate entities, and asks this

Court to apply that principle to ATS cases. 534 U.S. 61, 63 (2001). In *Malesko*, the Supreme

Court declared that "*Bivens'* purpose is to deter individual federal officers, not the agency, from

committing constitutional violations . . . [and] the threat of suit against an individual's employer

was not the kind of deterrence contemplated by *Bivens*." *Id.* at 69. "[I]f a corporate defendant is available for suit, claimants will focus their collection efforts on it, and not the individual directly responsible for the alleged injury." *Id.* at 71. Since "there would be no reason for aggrieved parties to bring damages actions against individual officers," "[t]he deterrent effects of the *Bivens* remedy would be lost." *Id.* at 70 (quoting *Fed. Deposit Ins. Corp. v. Meyers*, 510 U.S. 471, 485 (1994)). There is no reason to apply this reasoning to ATS cases. No court has held that ATS suits only exist to serve as a deterrent to tortfeasors who are natural individuals in the same way *Bivens* suits do. On the contrary, ATS suits serve the full panoply of tort goals, including compensation of the victim, punishment of the wrongdoer, and deterrence of both direct and indirect actors. As stated in *Tachiona v. Mugabe*,

> Like all other civil remedies, the causes of action authorized by the [ATS] and [the Torture Victim Protection Act] are intended to compensate victims and punish and deter the perpetrators. Were liability in such cases to be limited so as to permit recovery only from the particular natural individuals who actually commit the underlying wrongful acts, the result would effectively nullify the purposes of the statutes. Frequently the role of specified front-line actors in larger conspiracies is merely to execute the plans or follow orders issued by the scheme's leaders and institutional organizers. The lesser participants, though no less responsible, may have the least ability to evade jurisdiction or to satisfy a judgment of liability. Conversely, to exempt the organized perpetrators would allow an escape for actors with primary responsibility, encourage subterfuge and release the only players who may possess the resources to enable collection on any judgment rendered to the victims of the unlawful scheme.

169 F. Supp. 2d 259, 312 (S.D.N.Y. 2001), *rev'd in part on other grounds*, 386 F.3d 205 (2d. Cir. 2004); *see also In re Agent Orange*, 373 F. Supp. 2d at 58 ("Limiting civil liability to individuals while exonerating the corporation directing the individual's action through its complex operations and changing personnel makes little sense in today's world."). Since ATS

suits do not have the same limited purpose as *Bivens* actions, there is no basis for applying the same limiting principles. [21]

L-3 also argues that the Torture Victim Protection Act ("TVPA"), as a companion statute to the ATS, does not allow suits against corporate defendants and that that statute should guide interpretation of the ATS and the law of nations.  The Court is not persuaded.

The TVPA provides a civil cause of action for torture and summary execution committed under the authority or color of foreign law.  28 U.S.C. § 1350, statutory note, sec. 2(a).  Unlike the ATS, which only applies to aliens, both aliens and U.S. citizens may bring suit under the TVPA.  *See id.* at sec. 2(a)(2).  Because the TVPA uses the word "individual" to describe possible defendants, *id.* at sec. 2(a), it must be acknowledged that some courts, reasoning that the word "individual" only includes natural persons and not corporations, have determined that TVPA claims cannot be made out against corporations.  *See Mujica v. Occidental Petrol. Corp.*, 381 F. Supp. 2d 1164, 1175-76 (C.D. Cal. 2005); *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1026 (W.D. Wash. 2005); *Beanal v. Freeport-McMoRan, Inc.*, 969 F. Supp. 362, 382 (E.D. La. 1997).  By extension, Defendants suggest that if U.S. citizens cannot sue corporations under the TVPA, it makes no sense to extend aliens the right to do so under the ATS.

Since this case involves the ATS and not the TVPA, the Court need not reach any definitive conclusions as to the meaning of the TVPA, though it bears noting that the word "individual" does not necessarily comprehend only natural persons; it may also comprehend an

---

[21] The Court recognizes that in *Al Shimari v. CACI Premier Technologies, Inc.*, the District Court for the Eastern District of Virginia dismissed ATS claims factually similar to those in the present case on the basis that ATS claims may not proceed against private individuals, and that claims against military contractors serving as interrogators in particular are too novel.  657 F. Supp. 2d 700, 727-28 (E.D. Va. 2009).  Based on its review of international law in Parts VI.B.1 and VI.B.2 of this Opinion, this Court believes that the legal status of the claims in this case is sufficiently well established with respect to suits against private actors to allow them to go forward.  As for the concern that suits against military contractors serving as interrogators are "too novel," the Court finds no reason to distinguish between contractor-interrogators and other types of private entities.

"individual" corporate entity. *See Clinton v. City of New York*, 524 U.S. 417, 428 (1998) (holding that word "individual" as used in statute includes a corporation and stating that "[t]here is no plausible reason why Congress would have intended to provide for such special treatment of actions filed by natural persons and to have precluded entirely jurisdiction over comparable cases brought by corporate persons," such that "[a]cceptance of the Government's new-found reading of [the statute] would produce an absurd and unjust result which Congress could not have intended.") (quotation marks omitted). Indeed, some courts have specifically interpreted the TVPA to allow for suits against corporations. *See Romero*, 552 F.3d at 1315 ("Under the law of this Circuit, the [TVPA] allows suits against corporate defendants.").

But even if this Court were to agree that the TVPA only applies to natural persons, that would not affect whether the ATS should apply to corporations. Whatever the case may be as to the TVPA, there is broad judicial agreement that the ATS provides for corporate liability. Indeed, the *Mujica* and *Beanal* cases, cited by Defendants for the proposition that the TVPA does not apply to corporations, expressly chose not to extend that rationale to ATS claims. *Mujica*, 381 F. Supp. 2d at 1178 n.13 (allowing ATS claims to proceed against a corporation notwithstanding dismissal of TVPA claims and stating that "[t]he Court does not believe that the TVPA precludes claims of torture and extrajudicial killing under the ATS"); *Beanal*, 969 F. Supp. at 376, 380-81 (declining to extend its TVPA determination to ATS claims and holding that under the ATS "a corporation found to be a state actor can be held responsible for human rights abuses which violate international customary law").

Finally, as to whether it makes sense to allow aliens to sue corporations under the ATS but not allow U.S. citizens to sue corporations under the TVPA, assuming the TVPA bars suits against corporations, that would hardly be the only difference between the ATS and the TVPA.

Under the ATS, aliens may sue for *any* violation of the law of nations, whereas U.S. citizens are limited to only two under the TVPA: torture and summary execution. Suits under the TVPA also contain procedural limitations, such as an exhaustion of remedies requirement, which are not part of the ATS. 28 U.S.C. § 1350, statutory note, sec. 2(b); *Sosa*, 542 U.S. at 733 n.21 (electing not to require exhaustion of remedies for ATS suits). Congress, in writing the TVPA, could have chosen to broaden the ATS and give U.S. citizens the right to sue for violations of the laws of nations to the same extent as aliens. That it did not do so, and instead created a more limited cause of action in the TVPA, is not grounds for contracting the scope of the ATS.

**D. Whether Cruel, Inhuman, and Degrading Treatment Is a Recognized Violation of the Law of Nations Under the ATS (Counts 4 - 6)**

Defendants assert that Plaintiffs' ATS claims based on cruel, inhuman, and degrading treatment must be dismissed since CIDT is not a recognized violation of the law of nations. While a few judicial decisions support Defendants' position, viewing international law and judicial authority through the lens of *Sosa* tends to support a contrary view - that CIDT is among the violations of the law of nations actionable under the ATS.

Many of the same international agreements and conventions which ban and condemn torture also outlaw CIDT. *See, e.g.*, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 16, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 113, 116 ("Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article 1."); African Charter on Human and Peoples' Rights, art. 5, June 27, 1981, 21 I.L.M. 58 (1982) ("All forms of exploitation and degradation of man particularly slavery, slave trade, torture, cruel, inhuman or degrading punishment and treatment shall be prohibited."); American Convention on Human Rights, art. 5, cl. 2, 1144 U.N.T.S. 123

(entered into force July 18, 1978) ("No one shall be subjected to torture or to cruel, inhuman, or degrading punishment or treatment."); Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, G.A. Res. 3452, U.N. Doc. A/10034 (Dec. 9, 1975) ("No State may permit or tolerate torture or other cruel, inhuman or degrading treatment or punishment."); European Convention for the Protection of Human Rights and Fundamental Freedoms, Art. 3, Council of Europe, Europ. T.S. No. 5, 213 U.N.T.S. 211 (1968) ("No one shall be subjected to torture or to inhuman or degrading treatment or punishment."); International Covenant on Civil and Political Rights, art. 7, Dec. 19, 1966, 999 U.N.T.S. 171 ("No one shall be subjected to torture or to cruel, inhuman, or degrading treatment or punishment."); Universal Declaration of Human Rights, art. 5, G.A. Res. 217A(III), U.N. GAOR, 3d Sess., 1st plen. mtg., U.N. Doc. A/810 (Dec. 12, 1948) ("[N]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."). The Restatement (Third) of Foreign Relations Law of the United States also posits that a state violates international law when it engages in "torture or other cruel, inhuman, or degrading treatment or punishment." *Id.* at § 702.

Laws of the United State dealing with foreign relations also suggest that CIDT is a violation of international law. *See* 7 U.S.C. § 1733(j)(1)(A) (the United States will not engage in certain agricultural agreements with "any country determined by the President to engage in a consistent pattern of gross violations of internationally recognized human rights, including-- . . . the torture or cruel, inhuman, or degrading treatment or punishment of individuals"); 22 U.S.C. § 2151n(a) (prohibiting provision of developmental assistance "to the government of any country which engages in a consistent pattern of gross violations of internationally recognized human rights, including torture or cruel, inhuman, or degrading treatment or punishment"); 22 U.S.C. §

2304 (stating in statutory definition section that "the term 'gross violations of internationally recognized human rights' includes torture or cruel, inhuman, or degrading treatment or punishment").

Judicial precedent further supports recognizing CIDT as a viable claim under the ATS. *See, e.g.*, *Sarei v. Rio Tinto PLC*, 650 F. Supp. 2d 1004, 1028-30 (C.D. Cal, 2009) (reconsidering an earlier decision which had found CIDT did not violate the law of nations and holding CIDT actionable under the law of nations, but that the specific factual allegations in that case did not show a violation), *reconsidering* 221 F. Supp. 2d 1116, 1162-63 n.190 (C.D. Cal. 2002); *Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1092-95 (N.D. Cal. 2008) (reviewing international agreements, treaties, and judicial decisions and determining that "[t]he prohibition of cruel, inhuman and degrading treatment has been widely recognized in numerous sources of international law"); *Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1023 (S.D. Ind. 2007) (holding that there is a "general international norm against cruel, inhuman and degrading treatment," though plaintiffs claims do not constitute a recognized violation of that norm); *Mujica v. Occidental Petroleum Corp*, 381 F. Supp. 2d 1164, 1181 (C.D. Cal. 2005) (considering decisions by foreign and domestic courts and holding "that there is a customary international law norm against cruel, inhuman, and degrading treatment," but that plaintiff's allegations do not rise to the level of a violation); *Doe v. Qi*, 349 F. Supp. 2d 1258, 1320-25 (N.D. Cal. 2004) (considering "court decisions, the work of jurists and the usage of nations" and holding "that conduct sufficiently egregious may be found to constitute cruel, inhuman or degrading treatment under the [ATS]"); *Tachiona v. Mugabe*, 234 F. Supp. 2d 401, 437 (S.D.N.Y. 2002) ("[T]he infliction of cruel, inhuman or degrading treatment . . . is universally condemned and renounced as offending internationally recognized norms of civilized conduct."); *Jama v. United States*

*Immigration and Naturalization Serv.*, 22 F. Supp. 2d 353, 363 (D.N.J. 1998) (analyzing sources

of international law and finding that "[t]he mental and physical abuses which are alleged to have

been inflicted upon plaintiffs violate the international human rights norm of the right to be free

from cruel, unhuman and degrading treatment"); *Xuncax v. Gramajo*, 886 F. Supp. 162, 186 (D.

Mass. 1995) (noting how "the major international agreements on human rights generally treat the

norm proscribing cruel, inhuman, or degrading treatment in parity with the prohibition against

official torture").

Defendants cite two cases in support of their argument that CIDT does not violate the law

of nations.  In *Aldana v. Del Monte Fresh Produce, N.A.*, the Eleventh Circuit's entire discussion

of CIDT consisted of the following:

> Based largely on our reading of *Sosa,* we agree with the district court's
> dismissal[22] of Plaintiffs' non-torture claims under the Alien Tort Act.  We see no
> basis in law to recognize Plaintiffs' claim for cruel, inhuman, degrading treatment
> or punishment.  In reaching this conclusion, we acknowledge that two district
> courts of this Circuit recognized such a cause of action.  *See Mehinovic v.
> Vuckovic*, 198 F. Supp. 2d 1322, 1347 (N.D. Ga. 2002) (Bosnian war crimes);
> *Cabello v. Fernandez-Larios*, 157 F. Supp. 2d 1345, 1361 (S.D. Fla. 2001)
> (political assassination) *aff'd on different grounds by* 402 F.3d 1148, 1161 (11th
> Cir. 2005).  But both of those courts relied on the International Covenant on Civil
> and Political Rights, *Mehinovic*, 198 F. Supp. 2d at 1347, *Cabello*, 157 F. Supp.
> 2d at 1361.  *Sosa* explains that the International Covenant did not "create
> obligations enforceable in the federal courts."  124 S.Ct. at 2767.  Accordingly,
> we affirm the district court's decision on the cruel, inhuman, degrading treatment
> or punishment claims.

416 F.3d 1242, 1247 (11th Cir. 2005) (footnote added).  Because *Aldana* does not undertake

analysis of international law in the manner which *Sosa* requires, this Court finds it unpersuasive.

The majority in *Aldana* did not survey the sources of international law in evaluating CIDT.[23]

---

[22] The district court in *Aldana* determined that plaintiffs had not properly raised the issue and therefore declined to
consider whether CIDT existed as a violation of the law of nations.  305 F. Supp. 2d 1285, 1295, n.5 (S.D. Fla.
2003).

[23] In marked contrast, Judge Barkett, dissenting from a decision by the Eleventh Circuit not to rehear *Aldana* en
banc, presented a scholarly analysis of the treatment of CIDT in international law.  452 F.3d 1284 (11th Cir. 2006).

Moreover, it appears to have misapplied *Sosa*'s comments regarding the International Covenant on Civil and Political Rights ("ICCPR"). In *Sosa*, the Supreme Court analyzed provisions of the ICCPR in order to determine whether the "prohibition of arbitrary arrest has attained the status of binding customary international law," since the ICCPR "did not itself create obligations enforceable in the federal courts." *Sosa*, 542 U.S. at 735. As *Sosa* explained, and as Judge Barkett recognized in her dissent in *Aldana*, there is no one source from which a court determines the law of nations. *Sosa*, 542 U.S. at 734; *Aldana*, 452 F.3d at 1285. Unlike the U.S. Code, international law is not codified in a single place. It is found by evaluating whether there is a consensus among the "customs and usages of civilized nations," as shown in such sources as international agreements and treaties, scholarly works, domestic statutes dealing with international issues, and judicial opinions. *Sosa*, 542 U.S. at 734. In *Sosa*, the ICCPR in and of itself may not have sufficed to show that plaintiff's claim of arbitrary detention was a violation of the law of nations, given that other sources of international law were not found to support a similar consensus on claims of arbitrary detention. *Id.* at 734-35. But this did not and does not mean that courts should never look to the ICCPR for guidance in evaluating the law of nations. Rather, the ICCRP must be viewed in conjunction with other sources of international law as part of a larger survey. And in the present case, when the ICCPR is considered alongside the many other sources of international law that address CIDT, in the Court's view a fair consensus emerges that CIDT is indeed a violation of the law of nations. *See also Bowoto*, 557 F. Supp. 2d at 1093 (declining for similar reasons to follow *Aldana* in determining whether CIDT violates the law of nations).

---

After considering numerous declarations, conventions, treaties, statutes, and foreign and domestic judicial decisions on the issue, she concluded that "[w]hen one looks to the sources of international law identified in *Sosa* - treaties, judicial decisions, the practice of governments, and the opinions of international law scholars - it is clear that there exists a universal, definable, and obligatory prohibition against cruel, inhuman, or degrading treatment or punishment, which is therefore actionable under the [ATS]." *Id.* at 1285.

The second case cited by Defendants, *Forti v. Suarez-Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987) (*Forti I*), *affirmed in part and modified in part on other grounds on reconsideration*, 694 F. Supp. 707 (N.D. Cal1988) (*Forti II*), also considered whether CIDT was sufficiently well defined under the law of nations to form the basis of an ATS claim. In *Forti II*, the court accepted that many sources of international law in fact recognize CIDT as a violation. 694 F. Supp. at 711-12. But it held that, "[w]hile these and other materials establish a recognized proscription of 'cruel, inhuman or degrading treatment,' they offer no guidance as to what constitutes such treatment." *Id.* at 712. Since the boundaries of what was and was not CIDT were not defined clearly enough at the time, at least in that district judge's opinion, the court held that CIDT was not actionable under the ATS. *Id.*

Assuming *Forti II* may have been correct in stating that the exact bounds of what constitutes CIDT were not perfectly defined in 1988, this Court does not find that to be grounds for rejecting the cause of action in 2010. Indeed, with the exception of *Aldana*, "nearly every case addressing the question subsequent to *Forti* has held that conduct sufficiently egregious may be found to constitute cruel, inhuman or degrading treatment." *Qi*, 349 F. Supp. 2d at 1322. "Despite the absence of a distinct definition for what constitutes cruel, inhuman or degrading treatment, various authorities and international instruments make clear that this prohibition is conceptually linked to torture by shades of misconduct discernible as a continuum." *Tachiona*, 234 F. Supp. 2d at 437. "The gradations of the latter are marked only by the degrees of mistreatment the victim suffers, by the level of malice the offender exhibits and by evidence of any aggravating or mitigating considerations that may inform a reasonable application of a distinction." *Id.*; Restatement (Third) of Foreign Relations Law of the United States § 702, reporters' note 5 ("The difference between torture and cruel, inhuman, or degrading treatment or

punishment 'derives principally from a difference in the intensity of the suffering inflicted.'")

(quoting *Ireland v. United Kingdom*, 25 Pub. Eur. Ct. Hum. Rts., ser. A. para. 167 (1978)).

Accordingly, "cruel, inhuman and degrading treatment claims may be brought under [the] ATS if the specific conduct alleged by the plaintiffs has been universally condemned as cruel, inhuman, or degrading." *Bowoto*, 557 F. Supp. 2d at 1094; *Roe I*, 492 F. Supp. 2d at 1023 (applying the approach of "focusing on the particular conduct in question to decide whether the customary international norm against cruel, inhuman, and degrading treatment is sufficiently specific, universal and obligatory as applied to that conduct."). Instead of trying to draw boundaries that address all hypothetical factual situations, "the Court must consider whether the conduct alleged in this case has been universally condemned as cruel, inhuman, or degrading." *Bowoto*, 557 F. Supp. 2d at 1094 (quotation marks omitted).

> It is not necessary that every aspect of what might comprise a standard such as "cruel, inhuman or degrading treatment" be fully defined and universally agreed upon before a given action meriting the label is clearly proscribed under international law, any more than it is necessary to define all acts that may constitute "torture" or "arbitrary detention" in order to recognize certain conduct as actionable misconduct under that rubric.

*Xuncax*, 886 F. Supp. at 187.

> That it may present difficulties to pinpoint precisely where on the spectrum of atrocities the shades of cruel, inhuman, or degrading treatment bleed into torture should not detract from what really goes to the essence of any uncertainty: that, distinctly classified or not, the infliction of cruel, inhuman or degrading treatment . . . is universally condemned and renounced as offending internationally recognized norms of civilized conduct.

*Tachiona*, 234 F. Supp. 2d at 437.

This Court believes *Sosa* supports this method of analyzing potential violations of the law of nations since *Sosa* used the same approach to determine whether the plaintiff in that case could proceed on a claim of arbitrary detention. The Supreme Court in *Sosa* did not try to set a

hard and fast rule that delineated the inner and outer limits applicable in every case of arbitrary

detention. *See* 542 U.S. at 735-38. Instead, it noted that "it is useful to examine [plaintiff]'s

complaint in greater detail" and ruled that, based on the specific facts alleged, "[i]t is enough to

hold that a single illegal detention of less than a day, followed by the transfer of custody to

lawful authorities and a prompt arraignment, violates no norm of customary international law so

well defined as to support the creation of a federal remedy." *Id.* at 735, 738. "Any credible

invocation of a principle against arbitrary detention that the civilized world accepts as binding

customary international law requires a factual basis beyond relatively brief detention in excess of

positive authority." *Id.* at 737. Indeed, post-*Sosa* cases considering arbitrary detention have

adopted this approach of looking to the universal condemnation *vel non* of the specific conduct at

issue instead of simply interpreting *Sosa* to mean that the standard for arbitrary detention is not

yet fully and completely defined and therefore arbitrary detention does not exist as a violation of

the law of nations. *See, e.g.*, *Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457,

466 (S.D.N.Y. 2006).

The Court finds that Plaintiffs have set forth facts sufficient to constitute CIDT. A

sampling of the mistreatment alleged in the Complaint reflects such acts as beatings, electric

shocks, threats of death and rape, mock executions, and hanging from the hands and feet. These

acts may justify a finding of torture; they may also justify a claim which falls into the broader

category of wrongful behavior classified as cruel, inhuman, and degrading treatment (Counts 4 –

6).

## VII. Choice of Law

Defendants assert that Iraqi law applies to Plaintiffs' state law claims (Counts 10-20) and

that under Iraqi law, some if not all of those claims must be dismissed. Plaintiffs contend that

Iraqi law does not apply, and that the case is governed by either general federal common law, the law of a yet-to-be-determined State of the United States which can be ascertained through discovery, or the law of Maryland.

## A. Whether General Federal Common Law Applies

Plaintiffs argue that their Counts 10 – 20 are in fact not state law claims at all, but arise instead under federal common law. The Court rejects this argument. The traditional general principle, of course, is that "[t]here is no federal general common law." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). True, time has witnessed exceptions to this proposition, but while some limited areas exist in which courts have applied federal common law, *see Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981), the Court is not aware that such exceptions have been extended to include the type of tort claims made here. The two cases Plaintiffs cite, *In re Peanut Crop Insurance Litigation*, 524 F.3d 458, 470 (4th Cir. 2008), and *Long Island Savings Bank, FSB v. United States*, 503 F.3d 1234, 1245 (Fed. Cir. 2007), do not dictate a contrary conclusion. Both cases deal with the rule that contracts entered into by the United States are controlled by federal common law, absent legislation indicating that another body of law applies. These cases, however, say nothing about torts involving private parties and in no way suggest that the fundamental rule of *Erie* is displaced in the context of torts of the type pled here. Plaintiffs also cite a number of federal statutes which prohibit torture, claiming that these statutes give them a right to bring their tort claims under federal law. None of these statutes, however, creates an express private cause of action, and the Court declines to derive implied private causes of action from these statutes. *See Alexander v. Sandoval*, 532 U.S. 275, 286-287 (2001).

## B. Application of Maryland Choice of Law Principles

Since Counts 10 – 20 are not governed by federal law, the Court is required to engage in a choice of law analysis to determine whose law applies. When determining whose substantive law applies to diversity claims, a district court applies the conflict of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941). Since the Court is located in the State of Maryland, Maryland's conflict of law rules apply.

"Maryland adheres to the *lex loci delicti* rule in analyzing choice of law problems with respect to causes of action sounding in torts." *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 230 (Md. 2000); *Kortobi v. Kass*, 957 A.2d 1128, 1139 (Md. App. 2008); *see also Lab. Corp. of Am. v. Hood*, 911 A.2d 841, 845 (Md. 2006) ("Unlike most other States, which have abandoned the *lex loci delicti* approach espoused in §§ 378-390 of the Restatement (First) of Conflicts of Law in favor of the 'significant contacts' test enunciated in §§ 6, 145, and 146 of the Restatement (Second) of Conflicts of Law, Maryland continues to adhere generally to the *lex loci delicti* principle in tort cases.").

"*Lex loci delicti* dictates that 'when an accident occurs in another state substantive rights of the parties, even though they are domiciled in Maryland, are to be determined by the law of the state in which the alleged tort took place.'" *Philip Morris*, 752 A.2d at 230 (quoting *White v. King*, 223 A.2d 763, 765 (Md. 1966)). "Where the events giving rise to a tort action occur in more than one state, the court must apply 'the law of the State where the injury - the last event required to constitute the tort - occurred.'" *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008) (quoting *Erie Ins. Exch. v. Heffernan*, 925 A.2d 636, 649 (Md. 2007)). Maryland courts have noted that "[b]ecause Maryland is among the few states that continue to adhere to the traditional conflict of laws principle of *lex loci delicti,* the First Restatement of Conflict of Laws, while of merely historical interest elsewhere, continues to

provide guidance for the determination of *lex loci delicti* questions in Maryland." *Hood*, 911 A.2d at 845 (citation omitted). Thus, as stated in the Restatement (First) of Conflict of Law § 377, note 1 (1934),

> [W]hen a person sustains bodily harm, the place of wrong is the place where the harmful force takes effect upon the body. Such a force is first set in motion by some human being. It is quite immaterial in what state he set the force in motion. It must alone or in cooperation with other forces harm the body of another. The person harmed may thereafter go into another state and die from the injury or suffer other loss therefrom. The place where this last event happens is also immaterial. The question is only where did the force impinge upon his body.

Given these principles, looking as they do to where the alleged unlawful force impinged upon the body, the inescapable conclusion is that the alleged wrongs occurred in Iraq. It was there that Defendants supposedly tortured and otherwise mistreated Plaintiffs. Nothing in the Complaint suggests that any harm took effect on Plaintiffs' bodies anywhere outside of Iraq. Thus, even if orders to carry out the alleged abusive acts came from one of L-3's United States-based offices, "[i]t is quite immaterial in what state [the tortfeasor] set the force in motion." *Id.* If orders had come from the United States but had not been carried out and Plaintiffs had not been touched, the alleged tort would have been incomplete since there would have been no damage to Plaintiffs. Not until the abusive acts were carried out in Iraq did the last acts necessary to constitute the torts occur. Under Maryland's *lex loci delicti* rule, Iraq emerges as the place of the wrong.

Plaintiffs suggest that in any event their claims of negligent hiring and negligent supervision against L-3 should be treated differently. As to this, they say that at least some negligent acts of hiring and supervision on the part of L-3 may have occurred in the United States, and therefore the actionable wrong may be said to have occurred in the state where these negligent acts occurred. In the Court's opinion, however, this position misconstrues the *lex loci*

*delicti* rule.  The rule does not treat general negligence and negligent hiring and supervision differently.

In *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, a car accident victim sued a trucking company whose truck hit him.  529 F. Supp. 2d 604, 605-06 (D. Md. 2008).  The trucking company was based in Maryland and the accident occurred in New Jersey.  *Id.*  In his suit against the trucking company, brought in Maryland, the plaintiff included a claim for negligent supervision of its drivers and for improper training of them.  *Id.* at 605.  In discussing choice of law issues and applying the *lex loci delicti* rule, the Maryland federal court concluded that, regardless of where any negligent acts of supervision and training may have occurred, New Jersey law applied to all of the negligence claims because the accident occurred in New Jersey.  *Id.* at 607.  Since the trucking company was "allegedly negligent for not properly . . . supervising its agents," said the court, "the issue of its liability is also clearly determined by New Jersey law."  *Id.* at 607, n.4.  The court also stated that "decisions by the Court of Appeals of Maryland provide further support for applying the law of the place of injury, not the place of negligent conduct."  The court did not suggest there was any reason for treating negligent supervision claims differently.  *Id.* at 607; *Baker v. Booz Allen Hamilton, Inc.*, No. 08-1152, 2009 WL 5125672, at *3-4 (4th Cir. Dec. 28, 2009) (unpublished *per curiam* decision) (applying Maryland's *lex loci delicti* rule) (in negligent hiring and supervision suit brought in Maryland against Virginia-based employer of American contractor working in Kyrgyzstan who raped child of another American contractor in Kyrgyzstan, district court held that Kyrgyz tort law applied; affirming district court's decision on other grounds); *see also Romero v. Drummond Co.*, 552 F.3d 1303, 1309 (11th Cir. 2008) (applying Alabama's *lex loci delicti* rule) (where Colombian trade union leaders were tortured and murdered in Colombia by paramilitary group which was

allegedly hired to do so by executives of Alabama-based mining company, negligent supervision claim against mining company was governed by Colombian instead of Alabama law since harm to plaintiffs occurred in Colombia).

In the present case, even assuming that any of the allegedly negligent conduct occurred somewhere in the United States, its effects ultimately were felt in Iraq in the form of the alleged torture and mistreatment of Plaintiffs. As with the intentional torts, the negligent hiring and supervision torts would not have been complete until the injury occurred in Iraq. Therefore, under Maryland's *lex loci delicti* rule, Iraqi law applies to all of Plaintiffs' state law claims.

## C. Whether Plaintiffs' Claims Are Barred By Coalition Provisional Authority Order Number 17

Inasmuch as Iraqi law applies to Counts 10 – 20, Defendants argue that they possess immunity under Iraqi law by reason of an Order issued by the Coalition Provisional Authority ("CPA"), the governing body established in Iraq after the invasion. The Order, they claim, immunizes them from all Iraqi law and since Iraqi law applies to the state law claims, those claims must be dismissed. Plaintiffs say that the referenced Order only prevents Defendants from facing suit in a court of Iraq; it does not make them immune from Iraqi law to the extent that they are not obliged to face suit in a U.S. court applying Iraqi law.

During the occupation, the CPA put into effect Coalition Provisional Authority Order Number 17 (June 27, 2003) (hereinafter "Order 17"). Among other things, Order 17 stated in regard to contractors that

> 1) Coalition contractors and their sub-contractors as well as their employees not normally resident in Iraq, shall not be subject to Iraqi laws or regulations in matters relating to the terms and conditions of their contracts in relation to the Coalition Forces or the CPA. Coalition contractors and sub contractors other than contractors and sub-contractors normally resident in Iraq shall not be subject to Iraqi laws or regulations with respect to licensing and

registration of employees, businesses and corporations in relation to such contracts.

2) Coalition contractors and their sub-contractors as well as their employees not normally resident in Iraq, shall be immune from Iraqi Legal Process[24] with respect to acts performed by them within their official activities pursuant to the terms and conditions of a contract between a contractor and Coalition Forces or the CPA and any sub-contract thereto.

Order 17, § 2(1), (2) (footnote added).

The CPA issued an updated and expanded version of the Order a year later. Coalition Provisional Authority Order Number 17 (Revised) (June 27, 2004) (hereinafter "Revised Order 17"). The equivalent section of Revised Order 17 provided that

2) Contractors shall not be subject to Iraqi laws or regulations in matters relating to the terms and conditions of their Contracts, including licensing and registering employees, businesses and corporations; provided, however, that Contractors shall comply with such applicable licensing and registration laws and regulations if engaging in business or transactions in Iraq other than Contracts. Notwithstanding any provisions in this Order, Private Security Companies and their employees operating in Iraq must comply with all CPA Orders, Regulations, Memoranda, and any implementing instructions or regulations governing the existence and activities of Private Security Companies in Iraq, including registration and licensing of weapons and firearms.

3) Contractors shall be immune from Iraqi legal process with respect to acts performed by them pursuant to the terms and conditions of a Contract or any sub-contract thereto. Nothing in this provision shall prohibit MNF Personnel from preventing acts of serious misconduct by Contractors, or otherwise temporarily detaining any Contractors who pose a risk of injury to themselves or others, pending expeditious turnover to the appropriate authorities of the Sending State. In all such circumstances, the appropriate senior representative of the Contractor's Sending State in Iraq shall be notified.

Revised Order 17, § 4(2),(3).

A review of both the original and revised Orders indicates that whether the contractors possess immunity from liability for wrongful conduct turns on the "terms and conditions" of their contract. As the Court has noted in Part VI.A of this Opinion in discussing derivative sovereign immunity, however, Defendants' contracts are not presently before it. Without these

---

[24] "Legal process" is defined in the Order as "any arrest, detention or legal proceedings in the Iraqi courts or other Iraqi bodies, whether criminal, civil, administrative or other in nature." Order 17, § 1(3).

documents, the Court is unable to determine the extent to which one or more of the claims set forth in Counts 10 - 20 relate to the terms and conditions of Defendants' contract in the context of these Orders. The Court is therefore constrained to defer decision on this issue until such time as it is in a position to consider the actual terms and conditions of Defendants' contracts. For the present, the Motions to Dismiss on this ground are denied.

## D.  Whether Aiding and Abetting and Conspiracy are Recognized Torts Under Iraqi Law and Whether Iraqi Law Allows Punitive Damages

Defendants argue that aiding and abetting and conspiracy are not cognizable causes of action under Iraqi tort law and that Plaintiffs' state law claims premised on these theories (Counts 11, 12, 14, 15, 16, 17) must therefore be dismissed. Defendants also assert that punitive damages are not allowed as a remedy under Iraqi law and that accordingly Plaintiffs' request for punitive damages in connection with their state law claims must be stricken. Plaintiffs affirm not only that both causes of action are recognized, but that punitive damages are allowed as to all state law claims. The parties have submitted affidavits from Iraqi law experts in support of their respective positions. Here too, in the Court's opinion, any determination at this juncture would also be premature. There are genuine issues of material fact to be resolved even if they remain preliminary ones for the Court to decide. The Court will therefore defer decision with respect to the content of Iraqi law until after it addresses the effect of Order 17 on the state claims, since a finding in favor of Defendants on the Order 17 issue would result in dismissal of all of the state law claims, rendering the issue of the precise content of Iraqi law moot.

## E.  Whether Maryland Public Policy Requires Application of Maryland Law

If all or some of their claims are dismissible based on Order 17 or as being non-cognizable under Iraqi law, Plaintiffs suggest that such a dismissal would violate the public policy of Maryland and that the Court should therefore apply Maryland law pursuant to the

public policy exception to the *lex loci delicti* rule. *Lab Corp. of Am. v. Hood*, 911 A.2d 841, 848-51 (Md. 2006). Since the Court has determined to revisit all the related underlying issues at a later stage, it will also defer consideration of whether Iraqi law violates Maryland public policy such that Maryland law should apply to the state law claims notwithstanding the rule of *lex loci delicti*.

## VIII. Whether Plaintiffs Have Adequately Pled that There Was a Conspiracy and Aiding and Abetting

Defendants seek dismissal of the conspiracy and aiding and abetting counts (Counts 2, 3, 5, 6, 8, 9, 11, 12, 14, 15, 17, and 18) on the ground that Plaintiffs have not pled sufficient facts to make out those claims. Defendants principally rely on *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In *Twombly*, plaintiffs alleged an anti-trust conspiracy against regional phone companies. *Id.* at 550-51. Plaintiffs claimed that the phone companies had prevented startup carriers from developing in their respective regions and had also refrained from competing with one another in each others' regions. *Id.* The complaint did not assert that there was an actual agreement between the phone companies to engage in this anti-competitive behavior, but rather claimed that the conspiracy was demonstrated by the companies' "parallel conduct" in that they each had acted in the same manner. *Id.* The Supreme Court found that plaintiffs had not set forth enough evidence to show there was an agreement among and between the defendants, and therefore had not made out a claim for conspiracy. *Id.* at 564. The Court noted that the challenged conduct would not have been unlawful if undertaken independently by each defendant, as opposed to being part of an agreement. *Id.* at 553-54. The Court also recognized that each company had cited an independent reason for taking its actions and that these actions represented a continuation of historical behavior, as opposed to a change in behavior. *Id.* at 566-569. Absent more facts, said the Court, while the parallel conduct pled in the *Twombly*

complaint may have sufficed to make a "conceivable" claim of conspiracy, it did not suffice to make out a "plausible" claim which could survive a motion to dismiss. *Id.* at 570.

Defendants in the present case assert that, in similar fashion, all that the facts in the Complaint demonstrate is parallel conduct with regard to the alleged acts of torture; they do not provide sufficient information to show there was any agreement to torture, as a claim of conspiracy requires. Further, Defendants submit that the few statements in the Complaint asserting the existence of a conspiracy are merely legal conclusions, not statements of fact.

When determining whether an agreement exists to commit an unlawful act, courts consider a wide range of evidence. "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Manbeck v. Micka*, 640 F. Supp. 2d 351, 379 (S.D.N.Y. 2009) (quoting *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)); *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 184 (3d Cir. 2009) (noting "that direct evidence of a conspiracy is rarely available and that the existence of a conspiracy must usually be inferred from the circumstances"). Likewise, a conspiracy "need not be shown by proof of an explicit agreement;" it is sufficient that the "parties have a tacit understanding to carry out the prohibited conduct." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 792 (2d Cir. 2007); *Daily v. Gusto Records, Inc.*, 14 Fed. Appx. 579, 587 (6th Cir. 2001) ("The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy.") (citation omitted).

The Court finds that Plaintiffs have set forth sufficient facts to make out claims of conspiracy and aiding and abetting.

Looking first to the allegations against L-3, Plaintiffs state that L-3 employees committed many of the acts of torture described in the Complaint. Pls.' Second Am. Compl. ¶¶ 413, 424, 426, 427. Plaintiffs also allege that these L-3 employees "repeatedly bragged" about their mistreatment of detainees to L-3 management. *Id.* at ¶ 428. Plaintiffs claim further that L-3 had the authority to stop the wrongful acts of its employees but, despite knowing what they were doing, instead gave the employees continued permission to mistreating detainees. *Id.* at ¶¶ 425, 429-31, 439-41. Finally, Plaintiffs allege that L-3 took various steps to cover-up the alleged abuses, including: not reporting the conduct to the appropriate authorities, *id.* at ¶¶ 432-33, discouraging its employees from reporting prisoner abuse, *id.* at ¶ 434, destroying evidence, *id.* at ¶ 445(a), hiding prisoners from the Red Cross, *id.* at ¶ 445(c), and misleading the authorities about what was happening at the military prisons. *Id.* at ¶ 445(d). The Court concludes that from these facts, it is possible to infer more than merely parallel conduct. In other words, conspiratorial conduct may be inferred. Considering the facts pled in the light most favorable to Plaintiffs, L-3 is said to have given permission to its employees to torture and mistreat detainees, the employees and others working with them are claimed to have carried out the various alleged bad acts,[25] and L-3 is claimed to have covered up the abuses allowing the mistreatment to continue. Whereas the phone companies in *Twombly* were alleged only to have acted in their respective regions to carry out their anti-competitive acts without aid from each other, Defendants here are said to have interacted with one another on a continuous basis, knowing and approving of their complementary roles in bringing an overall scheme to fruition. In short, Defendants are fairly identified as co-conspirators or aiders and abettors.

---

[25] As discussed *infra*, some of these others are said to have included members of the military and employees of CACI. The participation of third-parties other than L-3 and L-3 employees makes the doctrine of intracorporate conspiracy immunity inapplicable. *See Robinson v. Canterbury Village, Inc.*, 848 F.2d 424, 431 (3d Cir. 1988) (conspiracy between corporation and its employees can be maintained "if independent third parties are alleged to have joined the conspiracy").

As for Defendant Nakhla, Plaintiffs have also set forth factual information to show he was part of a conspiracy. Nakhla himself is said to have committed some of the alleged acts of torture while being physically assisted by other people. *Id.* at ¶ 16 (stating that "Nakhla held Mr. Al-Quraishi down while a co-conspirator poured feces on him"); *id.* at ¶ 19 (describing Nakhla and others piling naked prisoners, including plaintiff Al-Quraishi, on top of each other); *id.* at ¶ 20 (plaintiff saw "Nakhla forcibly holding down a fourteen-year old boy as his co-conspirator raped the boy by placing a toothbrush in his anus").[26] That Nakhla purportedly committed these acts with the assistance of others travels well beyond an allegation of parallel conduct. Collaborating with other individuals at the same place and time to commit or facilitate specific abusive acts unquestionably suggests an agreement between the individuals to do so and is thus sufficient for a trier of fact to infer that Nakhla was part of a conspiracy directed against the detainees. Further, since Nakhla is one of the L-3 employees alleged to have physically carried out the acts of torture, he is encompassed in the facts just discussed which suggest that L-3 employees were part of the conspiracy.[27]

Defendants take particular exception to certain conclusory statements in the Complaint that a "conspiracy" existed or that a person was a "conspirator." Concededly, such statements standing alone do not pass muster for pleading purposes. Nevertheless, the Court finds it unnecessary to strike them from the Complaint. Such "legal conclusions can provide the

---

[26] The Court notes that while the allegation in paragraph 20 of the Complaint describes an act committed against a third-party and not a plaintiff, the fact that Nakhla committed the act while being assisted by another person fairly suggests that he may have been working in concert with other people in allegedly abusing the detainees in this case.

[27] Nakhla has moved for dismissal of all claims against him by the 71 plaintiffs other than Al-Quraishi since only Al-Quraishi specifically identifies Nakhla as one of the individuals who tortured him. Since plaintiffs have, however, made out a claim of conspiracy against Nakhla and L-3, they are able to maintain claims against him even if he did not personally take part in torturing them. *Proctor v. Metropolitan Money Store Corp.*, 645 F. Supp. 2d 464, 483 (D. Md. 2009) ("[A] defendant who agrees to do something illegal and opts into or participates in a conspiracy is liable for the acts of his co-conspirators even if the defendant did not agree to do or conspire with respect to a particular act."); *Attorney General of Maryland v. Dickson*, 717 F. Supp. 1090, 1095 (D. Md. 1989) ("It is well established that members of a conspiracy are jointly and severally liable for the actions committed by their co-conspirators during the course of and in furtherance of the conspiracy").

framework of a complaint," so long as they are also "supported by factual allegations." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Here, the Complaint lists the 72 plaintiffs one by one and describes the mistreatment and various types of abusive acts allegedly inflicted upon each. *See* Pls.' Second Am. Compl. ¶¶ 9-412. The Complaint then states that "[a]ll of these harms were inflicted on Plaintiffs by L-3 employees and others conspiring with them." *Id.* at ¶ 413. Nakhla was one of the aforementioned L-3 employees, *id.* at ¶ 414, and the "others" included members of the military and CACI, another military contractor. *Id.* at ¶¶ 419, 420. The word "conspiring" in paragraph 414, read in conjunction with the proceeding paragraphs of the Complaint, clarifies who carried out the various abusive acts listed in the body of the Complaint, viz. L-3 employees (including Nakhla), members of the military, and employees of CACI.

Considering Defendants' alleged behavior in the aggregate further suggests the presence of a conspiracy. The conduct alleged in *Twombly* "did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 129 S. Ct. at 1950 (discussing *Twombly*). In contrast, here, because of the inherent illegality of Defendants' alleged behavior and the lack of independent motivators, it is hardly more likely that "the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy." *Id.* at 566 (quoting *Kramer v. Pollock-Krasner Foundation*, 890 F. Supp. 250, 256 (S.D.N.Y. 1995)). Here, the facts pled by Plaintiffs may plausibly be read as indicating a conspiracy rather than uncoordinated independent action. That L-3 employees and other individuals working in military prisons all over Iraq might just happen to have randomly begun committing similar acts of torture against detainees while L-3 independently and simultaneously started covering up the ongoing conduct is theoretically possible. But it certainly does not

partake of the immediately apparent implausibility of the parallel conduct asserted in *Twombly*, which had a reasonable and lawful explanation. A plausible (not to say conclusive) inference from the allegations in the Complaint is that the widespread illicit behavior was not random but rather occurred as part of a broader plan, which is to say -- a conspiracy. *See Al Shimari v. CACI Premier Technology, Inc.*, 657 F. Supp. 2d 700, 731 (E.D. Va. 2009) (finding plaintiffs pled sufficient facts to make out a conspiracy arising out of torture by military contractors in Iraq and determining that "it is possible that the personnel at Abu Ghraib acted individually in pursuit of some perverse pleasure, but this possibility is insufficient to make Plaintiffs' conspiracy allegations less than plausible"); *see also Twombly*, 550 U.S. at 556, n.4 (noting that both sides conceded that that some extreme cases of parallel conduct such as "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy.") (citation omitted).

## IX.  Conclusion

For the foregoing reasons, Defendants' Motions to Dismiss [Papers No. 54 and 55] are **DENIED**.  To the extent that the Court has deferred finally deciding certain aspects of Defendant's Motions, they may be renewed on summary judgment following appropriate discovery.

A separate Order will issue.


/s/
_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

July 29, 2010